409 F.3d 127
 HEMPSTEAD VIDEO, INC., Plaintiff-Appellant,
v.
INCORPORATED VILLAGE OF VALLEY STREAM, George A. Donley, individually, and as Mayor of the Incorporated Village of Valley Stream, Michael Belfiore, individually, and as Deputy Mayor of the Incorporated Village of Valley Stream, Paul F. Brown, individually, and as Trustee of the Incorporated Village of Valley Stream, Edward R. Delucie Jr., individually, and as Trustee of the Incorporated Village of Valley Stream, Joanne T. Antun, individually, and as Trustee of the Incorporated Village of Valley Stream, Vincent W. Ang, individually, and as Clerk of the Incorporated Village of Valley Stream, and Jack Cutler, individually, and as Inspector of the Village of Valley Stream, Defendants-Appellees.
Docket No. 04-0578-CV.
Docket No. 04-0749-CV.
 United States Court of Appeals, Second Circuit.
 Argued: February 24, 2005.
 Decided: May 31, 2005.
 
 Paula Schwartz Frome, Garden City, NY, for Plaintiff-Appellant.
 Stanley A. Camhi, Jaspan Schlesinger Hoffman, LLP, Garden City, NY, for Defendants-Appellees.
 Before: LEVAL, CABRANES, and KATZMANN, Circuit Judges.
 LEVAL, Circuit Judge.
 
 
 1
 Plaintiff-appellant Hempstead Video, Inc. ("HV") appeals from a judgment of the United States District Court for the Eastern District of New York (E. Thomas Boyle, M.J.) in favor of the defendant, the Incorporated Village of Valley Stream, and related officials and entities (collectively "Valley Stream" or the "Village"). The magistrate judge ruled that HV breached its settlement agreement with Valley Stream, and that Valley Stream was therefore released from its obligations of forbearance under the agreement. The judge also denied HV's motion to disqualify Valley Stream's counsel. We affirm.
 
 BACKGROUND
 
 2
 HV, a corporation owned by James Alessandria, operates an adult video store in the Village of Valley Stream. Shortly after the store opened in 1994, HV became involved in a permit and zoning dispute with the Village. HV filed suit under 42 U.S.C. § 1983 in the United States District Court for the Eastern District of New York, alleging principally that Valley Stream was selectively enforcing its mercantile permit requirement in violation of the Equal Protection Clause of the Fourteenth Amendment.
 
 
 3
 The parties reached a settlement agreement on April 30, 1996, which was "so-ordered" by Magistrate Judge Boyle. Pursuant to the agreement, Valley Stream agreed to issue a mercantile permit and to treat HV in a manner "substantially similar" to other businesses. Valley Stream also agreed not to prosecute HV under its adult use ordinance, Local Law 4, as long as HV complied with the terms of the settlement agreement. HV agreed, among other things, to cover its windows so the interior of the store could not be viewed from the outside, to mark its store with only two signs reading "adult store" or "adult shop," and to refrain from any form of outdoor advertising. The portion of the settlement agreement that is crucial to this dispute states:
 
 
 4
 [HV] may continue to operate its business at its present location within the Village, provided that its business operation remains substantially the same as its current business operations. It is specifically understood that [HV] shall not have enclosed viewing rooms, live peep shows or live performances or similar type activities at the premises.
 
 
 5
 (emphasis added). The agreement goes on to provide that if one party believes the other is in breach, the complaining party is required to give the other party notice of the alleged violation, and it allows "twenty (20) days from receipt of the notice within which to cure such violation or seek appropriate relief from the Court."
 
 I. The Present Dispute
 
 6
 In January 2003, Valley Stream received an anonymous tip that HV had installed several booths for viewing pornographic videos. An inspection revealed six booths, each closed by a door which could be locked from the inside. Each booth contained a video monitor to display pornographic videos. Each was also equipped with a paper towel dispenser on the outside. The booths were approximately thirty-six inches wide, forty inches deep, and ninety to ninety-six inches high. The walls of the booths did not go all the way to the ceiling, but rather stopped approximately eighteen inches below the ceiling. With the doors closed, one could not see into the booths.
 
 
 7
 Valley Stream informed HV by a letter dated January 13, 2003 that it considered HV in breach of the settlement agreement's prohibition on "enclosed viewing rooms." The letter stated:
 
 
 8
 Pursuant to paragraph 12 of the aforementioned Settlement and Order, the Village hereby gives you written notice that you are in violation of paragraph 5 of said Settlement and Order and have twenty (20) days from receipt of this notice to cure such violation or seek appropriate relief from the court.
 
 
 9
 The letter demanded that HV permanently remove the booths.
 
 
 10
 The parties thereafter engaged in sporadic negotiations. HV suggested fitting the booths with Dutch doors or with curtains. The Village rejected the proposals, expressing the view that any barrier providing privacy and thus facilitating sex or masturbation on the premises would violate the agreement.
 
 
 11
 After nearly four months passed without resolution, Valley Stream wrote to the magistrate judge requesting a conference. At the conference, Valley Stream argued that by virtue of its breach of the settlement agreement, HV had forfeited its rights under the agreement, leaving Valley Stream free to prosecute under its adult use ordinance. The magistrate judge adjourned the proceeding, instructing Valley Stream to submit an order to show cause. That afternoon, HV removed the doors from the booths.
 
 
 12
 The magistrate judge held an evidentiary hearing on August 21, 2003, at which several witnesses testified, including Elena Winter, the former president and manager of HV, who testified for the Village. The magistrate judge then took the case under advisement.
 
 
 13
 II. The Motion to Disqualify Valley Stream's Counsel
 
 
 14
 On November 12, 2003, while the case was still under consideration by the magistrate judge, HV moved to disqualify the Village's attorney, Stanley A. Camhi, and his firm of Jaspan Schlesinger Hoffmann, LLP ("Jaspan"). HV based its motion primarily on the fact that its counsel for labor matters, William Englander, had become "of counsel" to the Jaspan firm in July 2003. HV also contended the Jaspan firm should be disqualified because one of Jaspan's lawyers, Jon Santemma, had a ten-minute telephone conversation with Alessandria, the owner of HV, about a condemnation proceeding in a neighboring town.
 
 
 15
 Englander's connection with the Jaspan firm had come about as follows. Prior to July 2003, Englander was a solo practitioner, renting office space from the Jaspan firm. He had periodically represented Alessandria and his businesses on labor matters for more than twenty years. In April 2003, he began assisting HV's present counsel in defending against a complaint Elena Winter had filed with the Equal Employment Opportunity Commission (EEOC), alleging that she was fired on account of her pregnancy.
 
 
 16
 Englander, who was in his mid-70s, decided to "semi-retire" and work fewer hours. He proposed to turn the representation of several of his clients, particularly a local school district, over to the Jaspan firm. He agreed to become "of counsel" to Jaspan effective July 1, 2003 "[i]n order to effect an orderly transition of those matters." As for the Englander clients not being transferred to Jaspan, which included Alessandria and HV, Englander continued to represent them in his individual capacity. Jaspan had no access to those clients' files.
 
 
 17
 At the time Jaspan called Winter as a witness against HV in this case, Jaspan was unaware of Englander's representation of HV in the EEOC proceedings initiated by Winter, and Englander was unaware of Jaspan's representation of Valley Stream in this proceeding against HV. There had been no communication between Englander and the Jaspan lawyers about either case.
 
 
 18
 The potential conflict came to light on September 18, 2003, when Englander, in connection with Winter's EEOC proceeding against HV, sent a letter to the EEOC written on Jaspan letterhead and faxed a copy to his co-counsel in that matter, who also represents HV in this suit. Englander asserted in his affidavit that his use of the Jaspan letterhead for that letter was "an inadvertent error" as Jaspan had no involvement in the matter. In a separate incident additionally cited by HV to support its disqualification motion, a woman who identified herself as being from the Jaspan firm, later telephoned Alessandria to ask for his fax number on Englander's behalf.
 
 
 19
 The alleged conflict involving Jon Santemma arose as follows. Santemma, who specializes in tax certiorari and condemnation proceedings, joined the Jaspan partnership in June 2003. Calls made to his number at his prior firm were automatically transferred to his phone at Jaspan. Alessandria phoned Santemma in July 2003, seeking advice about a condemnation proceeding being initiated by another town against another of Alessandria's stores.[1] Alessandria and Santemma spoke for approximately ten minutes. Santemma was not retained and never opened a file on the matter. There is no suggestion in the record that HV owned or operated the business which was the subject of the condemnation proceeding or had any connection with that business beyond the fact that the owner of its stock also owned the other business.
 
 III. The Magistrate Judge's Decisions
 
 20
 The magistrate judge granted Valley Stream's motion for a declaratory judgment on January 5, 2004. He rejected HV's contention that the booths were not "rooms," as prohibited by the settlement agreement, as well as its argument that the booths were not "enclosed" because of the eighteen-inch gap between the tops of the walls of the booths and the ceiling. The magistrate judge found as well that HV's failure to remedy its breach or seek relief from the court within twenty days of its receipt of notice released Valley Stream from its promise not to enforce Local Law 4 against HV. He rejected HV's argument that Valley Stream was estopped from seeking release from its obligations by virtue of its participation in negotiations with HV between January and June 2003.
 
 
 21
 The magistrate judge also denied HV's motion to disqualify the Jaspan firm. He concluded that Englander had represented HV in his capacity as a solo practitioner and was affiliated only loosely with Jaspan in a manner "too attenuated to merit imputation of the conflict of interest." He also concluded that the brief phone conversation between Alessandria and Santemma, which did not result in the retention of Santemma, was similarly insufficient to support disqualification.
 
 
 22
 HV brought this appeal.
 
 DISCUSSION
 
 23
 I. "[E]nclosed viewing rooms"
 
 
 24
 HV contends that its installation of six booths with doors that locked from the inside for viewing pornographic videos did not violate the settlement agreement's prohibition of "enclosed viewing rooms." The argument relies on the purported distinction between a "booth" and a "room," and the contention that, by virtue of the eighteen-inch space between the top of the booths and the ceiling, the booths were not "enclosed." We find these highly formalistic arguments unpersuasive. They depend on distinctions which do not conform to the apparent meaning of the settlement agreement.
 
 
 25
 HV's asserted distinction between "booths" and "rooms" is not supported even by dictionary definitions. Among the definitions of "room" found in Webster's Third New International Dictionary is "a part of the inside of a building, shelter, or dwelling, usu[ally] set off by a partition." Webster's Third New International Dictionary 1972 (1976) (definition 4a). This definition covers the booths installed by HV.
 
 
 26
 We also reject HV's argument that the eighteen-inch gaps at the tops of the walls rendered the rooms not "enclosed." It seems clear that the prohibition of enclosed rooms was designed to ensure that patrons would not have access to private areas sheltered from the sight of others to indulge in sex acts, whether in solitude or with a partner.[2] The booths permitted exactly that. We can see no reason to consider them beyond the scope of the prohibition. Of course, resort to the most stringent definition of "enclosed" would exclude even an airhole. It is quite clear the agreement did not use the word in so narrow and restrictive a sense as to exclude booths enclosed on all four sides, merely because they left an eighteen-inch gap above eye level at the tops of the walls. HV has submitted no evidence to support such a strained, unnatural interpretation of the agreement.
 
 
 27
 Even if we found merit in HV's purported distinctions between its booths and the "enclosed viewing rooms" prohibited by the agreement, it would not affect our judgment. The settlement agreement permitted HV to continue to operate its business only on the condition that "its business operation remains substantially the same as its current business operations." Regardless of whether the booths with video viewing equipment fall within the prohibition of "enclosed viewing rooms," there can be no doubt that the introduction of viewing booths represented a substantial change in the way HV conducted its business operations and therefore a violation of the settlement agreement.
 
 
 28
 The settlement agreement gives a party receiving notice of a potential breach "twenty (20) days from receipt of the notice within which to cure [the] violation or seek appropriate relief from the Court." HV contends that Valley Stream's participation in settlement negotiations led it to believe that the twenty-day deadline for remedying its breach or seeking judicial relief had been suspended.[3] Valley Stream, however, took no affirmative steps, as far as the record discloses, to foster this belief. Valley Stream initially warned HV about the twenty-day deadline and never told HV that it considered the deadline suspended. It was HV that initiated the settlement negotiations, and the negotiations consisted largely of HV making proposals, which Valley Stream rejected. HV has pointed to nothing in Valley Stream's repeated negative responses to its proposals that would have reasonably induced HV to conclude that it need not comply with the twenty-day deadline. Under the terms of the agreement, therefore, Valley Stream is released from its contractual obligation not to enforce its adult use ordinance.
 
 II. The Disqualification Motion
 
 29
 The authority of federal courts to disqualify attorneys derives from their inherent power to "preserve the integrity of the adversary process." Bd. of Educ. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir.1979). In exercising this power, we have attempted to balance "a client's right freely to choose his counsel" against "the need to maintain the highest standards of the profession." Gov't of India v. Cook Indus., Inc., 569 F.2d 737, 739 (2d Cir.1978); see also Emle Indus., Inc. v. Patentex, Inc., 478 F.2d 562, 564-65 (2d Cir.1973). Although our decisions on disqualification motions often benefit from guidance offered by the American Bar Association (ABA) and state disciplinary rules, see, e.g., Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225, 227 n. 2 (2d Cir.1977); Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d 751, 753 (2d Cir.1975), such rules merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification, see Nyquist, 590 F.2d at 1246 (disqualification is only warranted where "an attorney's conduct tends to taint the underlying trial," because other ethical violations can be left to federal and state disciplinary mechanisms (internal quotation marks omitted)).
 
 
 30
 One recognized form of taint arises when an attorney places himself in a position where he could use a client's privileged information against that client. The standard for disqualification varies depending on whether the representation is concurrent or successive. In cases of concurrent representation, we have ruled it is "prima facie improper" for an attorney to simultaneously represent a client and another party with interests directly adverse to that client. Cinema 5, Ltd. v. Cinerama, Inc., 528 F.2d 1384, 1387 (2d Cir.1976). The attorney "must be prepared to show, at the very least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation." Id. In cases of successive representation, we have held that an attorney may be disqualified if:
 
 
 31
 (1) the moving party is a former client of the adverse party's counsel;
 
 
 32
 (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and
 
 
 33
 (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.
 
 
 34
 Evans v. Artek Sys. Corp., 715 F.2d 788, 791 (2d Cir.1983).
 
 
 35
 An attorney's conflicts are ordinarily imputed to his firm based on the presumption that "associated" attorneys share client confidences. For example, New York Disciplinary Rule 5-105 states: "While lawyers are associated in a law firm, none of them shall knowingly accept or continue employment when any one of them practicing alone would be prohibited from doing so [under specific ethics rules, including those governing conflicts arising from concurrent and successive representations]." N.Y. COMP. CODES R. & REGS. tit. 22, § 1200.24(d) ("Disciplinary Rule 5-105"). As discussed below, however, attorneys with limited links to a firm are not always considered to be "associated" with the firm for purposes of conflict imputation.
 
 
 36
 Although some courts have treated the presumption that confidences are shared within a firm as irrebuttable, see, e.g., In re American Airlines, Inc., 972 F.2d 605, 614 n. 1 (5th Cir.1992), there is a "strong trend," which we join, toward allowing the presumption of confidence sharing within a firm to be rebutted, United States ex rel. Lord Elec. Co. v. Titan Pac. Constr. Corp., 637 F.Supp. 1556, 1564 (W.D.Wash.1986) (citing cases); see also, e.g., Manning v. Waring, Cox, James, Sklar & Allen, 849 F.2d 222, 224 (6th Cir.1988); Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Labs., Inc., 607 F.2d 186, 197 (7th Cir.1979) (en banc); Roberts & Schaefer Co. v. San-Con, Inc., 898 F.Supp. 356, 362-63 (S.D.W.Va.1995) (recognizing trend but criticizing it); Kassis v. Teacher's Ins. & Annuity Ass'n, 93 N.Y.2d 611, 695 N.Y.S.2d 515, 717 N.E.2d 674, 677-78 (1999); Solow v. W.R. Grace & Co., 83 N.Y.2d 303, 610 N.Y.S.2d 128, 632 N.E.2d 437, 442 (1994).
 
 
 37
 Prior to July 2003, Englander operated an entirely independent law firm, which leased space from Jaspan. He maintained separate files for his clients and there is no reason to believe he shared client confidences with Jaspan. Jaspan would not have been disqualified during this period by reason of Englander's representation of the adversary of one of its clients.
 
 
 38
 In July 2003, the relationship between Englander and Jaspan changed, but only to a limited degree. Englander was given the title "of counsel" and began to share a limited number of clients with Jaspan. In all other respects, Englander continued to operate a separate firm in the same manner he had before acquiring the new title. The question is whether this relationship requires disqualification of the Jaspan firm in this case.
 
 
 39
 The case before us does not fit easily within the existing framework for analyzing conflict imputation from an attorney to his firm. The first step in that framework is to determine whether an attorney is "associated" with the firm. If he is, a rebuttable presumption arises that the attorney and the firm share client confidences, and the court then proceeds to the second step, which involves determining whether that presumption has been rebutted. If the attorney is not "associated" with the firm, no presumption of confidence sharing arises, and, in the absence of other evidence demonstrating taint of the proceedings, the firm will not be disqualified. This framework functions most smoothly in cases where the relationship between the attorney and the firm is clear.
 
 
 40
 It is not altogether clear whether Englander should be deemed, for purposes of this binary rule, to be "associated" or "not associated" with the Jaspan firm. The magistrate judge placed Englander in the latter category, holding that his relationship with Jaspan was sufficiently limited that conflicts arising from his private representation of HV should not be imputed to the firm. In reaching this conclusion, however, the magistrate judge emphasized that "the Jaspan firm has been effectively screened from any knowledge that Mr. Englander may have regarding plaintiff and the danger of any unintentional transmission of client confidences is rather minuscule." The magistrate judge thus blended the first step in the traditional framework (whether the attorney is "associated" with the firm) with the second (whether the presumption of shared confidences has been rebutted). On the facts of this case, we find no error.
 
 
 41
 Whether an attorney is associated with a firm for purposes of conflict imputation depends in part on the existence and extent of screening between the attorney and the firm. See New York State Bar Ass'n Comm. on Prof'l Ethics, Op. 715 (1999) ("[W]e believe screens should be accepted as a means of ensuring that part time lawyers are not deemed to be `associated' with a law firm."). An "of counsel" attorney, who handles matters independent of his firm and scrupulously maintains files for his private clients separate from the files of the firm, is less likely to be considered associated with the firm with respect to those clients than another attorney in the same position whose client files are not effectively segregated from those of the firm. Similarly, whether the screening between an attorney and his firm is considered adequate to rebut the presumption of shared confidences depends in part on the closeness and extent of the relationship between the attorney and the firm.
 
 
 42
 With these considerations in mind, we examine Englander's situation under both the first and second steps of the traditional framework, cognizant of the interrelationship between the two in the case before us.
 
 
 43
 
 A. Imputation of the Conflicts of an "Of Counsel" Attorney to a Firm
 
 
 
 44
 Englander, of course, could not have represented Valley Stream against HV while simultaneously representing HV before the EEOC, see N.Y. COMP. CODES R. & REGS. tit. 22, § 1200.24(a), in the absence of client consent, see id. § 1200.24(c). But Englander did not represent Valley Stream against HV. Valley Stream was represented by the Jaspan firm, with which Englander had an "of counsel" relationship. We must consider whether Englander's potential conflict should be attributed to Jaspan by reason of his "of counsel" relationship.
 
 
 45
 At least two federal courts have adopted a per se rule imputing conflicts between all "of counsel" attorneys and their firms. See Roberts & Schaefer Co., 898 F.Supp. at 360-61 (interpreting a rule governing lawyers "associated" in a firm); see also Atasi Corp. v. Seagate Tech., 847 F.2d 826, 830 (Fed.Cir.1988) (interpreting a rule governing a "partner, or associate, or any other lawyer affiliated with him or his firm"). Ethics opinions issued by the New York State Bar Association and the ABA have also recommended imputing conflicts from "of counsel" attorneys to their firms. See New York State Bar Ass'n Comm. on Prof'l Ethics, Op. 773 (2004) ("[I]f a lawyer acting alone would be disqualified from a particular representation based on any of the rules enumerated in DR 5-105(D), then that disqualification is imputed to a law firm with which that lawyer has an `of counsel' relationship."); ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 90-357 (1990) ("There can be no doubt that an of counsel lawyer (or firm) is `associated in' and has an `association with' the firm (or firms) to which the lawyer is of counsel, for purposes of ... the general imputation of disqualification...."). But see New York State Bar Ass'n Comm. on Prof'l Ethics, Op. 715 (1999) (where an attorney is considered a "contract lawyer" rather than "of counsel," imputation of conflicts "depends upon whether the relationship of the contract lawyer to each employing law firm rises to the level of an association with the firm, which depends on the facts and circumstances of the employment").
 
 
 46
 A per se rule has the virtue of clarity, but in achieving clarity, it ignores the caution that "[w]hen dealing with ethical principles, ... we cannot paint with broad strokes. The lines are fine and must be so marked." Silver Chrysler, 518 F.2d at 753 n. 3 (quoting United States v. Standard Oil Co., 136 F.Supp. 345, 367 (S.D.N.Y.1955)). Given the wide variation in the nature and substance of relationships lumped together under the title "of counsel," a per se approach is ill-equipped to respect appropriately "both the individual's right to be represented by counsel of his or her choice and the public's interest in maintaining the highest standards of professional conduct." Hull v. Celanese Corp., 513 F.2d 568, 569 (2d Cir.1975). It also risks elevating the label assigned to a relationship over the substance of that relationship. See Fund of Funds, 567 F.2d at 235 ("[W]e have never believed that labels alone—partner, clerk, co-counsel—should control our decisions in so sensitive an area.").
 
 
 47
 We believe the better approach for deciding whether to impute an "of counsel" attorney's conflict to his firm for purposes of ordering disqualification in a suit in federal court is to examine the substance of the relationship under review and the procedures in place. The closer and broader the affiliation of an "of counsel" attorney with the firm, and the greater the likelihood that operating procedures adopted may permit one to become privy, whether intentionally or unintentionally, to the pertinent client confidences of the other, the more appropriate will be a rebuttable imputation of the conflict of one to the other. Conversely, the more narrowly limited the relationship between the "of counsel" attorney and the firm, and the more secure and effective the isolation of nonshared matters, the less appropriate imputation will be. Imputation is not always necessary to preserve high standards of professional conduct. Furthermore, imputation might well interfere with a party's entitlement to choose counsel and create opportunities for abusive disqualification motions.
 
 
 48
 Several district courts have followed this functional approach to disqualification motions involving "of counsel" attorneys, as did the magistrate judge in this case. In Renz v. Beeman, No. 87-CV-487, 1989 WL 16062, 1989 U.S. Dist. LEXIS 1784 (N.D.N.Y. Feb.21, 1989), the court declined to impute an "of counsel" attorney's conflict to his firm where the attorney worked full-time outside the firm as in-house counsel to a company; became "of counsel" for the sole purpose of obtaining the firm's assistance in representing his few remaining private clients; accepted no assignments from the firm; dealt with a single contact person at the firm; shared a secretary; and visited the firm only once every week or two. In Regal Marketing Inc. v. Sonny & Son Produce Corp., No. 01 Civ.1911, 2002 WL 1788026, 2002 U.S. Dist. LEXIS 14069 (S.D.N.Y. Aug.1, 2002), the court declined to impute a firm's conflict to an "of counsel" attorney where the attorney leased space on the same floor as the firm and occasionally collaborated with the firm or used one of the firm's secretaries to expedite a task; conducted most of his work separately; maintained separate professional liability insurance; and maintained separate phone, fax, and billing systems. In Gray v. Memorial Medical Center, Inc., 855 F.Supp. 377 (S.D.Ga.1994), the court declined to impute a firm's conflict to an "of counsel" attorney where the attorney consulted with the firm only sporadically; worked full-time for another firm in a different city; and had resigned his position as a shareholder to take "of counsel" status one month before the conflict arose.
 
 
 49
 We agree with the magistrate judge that Englander's relationship with Jaspan was too attenuated and too remote from the matter in question to attribute Englander's potential conflict to the firm. Englander became "of counsel" for the limited purpose of providing transitional services for several selected clients. He continued representing all his other clients, including HV and Alessandria, in his independent capacity. Moreover, the Jaspan firm had no access to the confidences of Englander's private clients. Englander maintained separate files for those clients in his private office, and Jaspan did not have access to the files. It is undisputed that Alessandria never discussed the present case with Englander, and Englander never discussed the details of either the present case or the EEOC case with anyone at Jaspan. As soon as Jaspan learned of the potential conflict, it instructed Englander not to discuss the EEOC case with anyone at the firm and to continue maintaining a separate file. We conclude on the basis of the foregoing facts that the magistrate judge correctly ruled that, for purposes of this dispute, Englander is not "associated" with the Jaspan firm and thus his conflict should not be attributed to it.[4]
 
 
 50
 
 B. Rebutting the Presumption of Shared Confidences
 
 
 
 51
 Even assuming, in the alternative, that Englander's potential conflict should be imputed, subject to rebuttal, to Jaspan by reason of his association with the firm, Englander's limited relationship with Jaspan, the screens put in place, and the uncontroverted affidavits filed by Englander and Camhi successfully rebut the presumption that Englander shared HV's confidences with the firm. This court has adopted no categorical rule against considering practices and structures that protect client confidences within a firm in determining whether an attorney or firm should be disqualified. Courts should inquire on the facts of the case before them whether the practices and structures in place are sufficient to avoid disqualifying taint.
 
 
 52
 Responding to two opinions of this Circuit discussing procedures that may screen and safeguard client confidences (sometimes referred to as "Chinese Walls"), Fund of Funds, 567 F.2d 225, and Cheng v. GAF Corp., 631 F.2d 1052 (2d Cir.1980) ("Cheng I"), vacated on other grounds, 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981), a few district courts have drawn a tentative inference that our Circuit may categorically reject the efficacy of isolation efforts as protection against taint. See, e.g., Young v. Cent. Square Cent. Sch. Dist., 213 F.Supp.2d 202, 217 (N.D.N.Y.2002); Mitchell v. Metro. Life Ins. Co., Inc., No. 01 Civ. 2112, 2002 WL 441194, at *9, 2002 U.S. Dist. LEXIS 4675, at *25 (S.D.N.Y. Mar. 21, 2002). This would be a mistaken reading of our precedents.
 
 
 53
 In Fund of Funds, a law firm, which acted generally as counsel to a major accounting firm, participated closely in the preparation of litigation brought against the accounting firm, charging it with complicity in a securities fraud. Our court ruled that the law firm was disqualified from participating in the litigation. Making a brief, oblique reference in a footnote to an argument advanced by the law firm in the district court, but not pursued on appeal, we said: "[The firm] argued below that it built a Chinese Wall .... The court below found that no such `Chinese Wall' could be created in a single firm. We incline to agree." Fund of Funds, 567 F.2d at 229 n. 10.
 
 
 54
 For several reasons, this should not be understood as a categorical rejection of quarantine or isolation as an efficacious protection against taint. First, the statement merely expressed an inclination and stopped short of asserting any rule. Second, the remark was dictum, referring to an issue not argued in the appeal. Third, the remark was so brief and imprecise that it is difficult to interpret; it might well have meant only that the conflict within the firm in the particular case was so acute that it was beyond any possibility of remedy through isolation. It is clear in any event that it would be a mistake to draw any far-reaching significance from this obscure and oblique remark.
 
 
 55
 Cheng I gives even less basis for inferring so categorical a rule.[5] In Cheng I, an attorney had essentially changed sides during the progress of a litigation. The attorney, although not assigned to the case, had initially worked in the tiny office (four to six attorneys) that represented the plaintiff. Cheng I, 631 F.2d at 1054. The attorney then took employment in the firm that represented the defendant—also a small office of approximately twenty lawyers. Id. at 1058 n. 6. When the plaintiff moved to disqualify the defending firm, the latter argued that the assignment of the switching lawyer to the health law area of the firm's practice, while the suit was being handled by the employment law section of the firm, together with affidavits that the attorney had not disclosed the plaintiff's confidences or discussed the merits of the case, effectively established a "Chinese Wall" rebutting any taint. Id. at 1054, 1057. The district court had accepted the argument and denied disqualification. We disagreed, perceiving in the particular facts too high a risk of inadvertent disclosure of confidences. We said, "[W]e are not satisfied that under the facts of this case the screening will be effective." Id. at 1058. We did not suggest any broad categorical rejection of the efficacy of isolation as protection against taint.
 
 
 56
 We see no reason why, in appropriate cases and on convincing facts, isolation—whether it results from the intentional construction of a "Chinese Wall," or from de facto separation that effectively protects against any sharing of confidential information—cannot adequately protect against taint. We so ruled in Armstrong v. McAlpin, 625 F.2d 433, 442-46 (2d Cir.1980) (en banc), although the ruling was vacated on a finding that we lacked appellate jurisdiction at the time the appeal was brought, see 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). See also Manning, 849 F.2d at 224-25; Schiessle v. Stephens, 717 F.2d 417, 421 (7th Cir.1983).
 
 
 57
 On the particular facts of this case, with special focus on Englander's double role—of counsel to the Jaspan firm only with regard to the cases he was turning over, while independent of the Jaspan firm as to the matters he retained—coupled with the district court's finding that Englander maintained separate files and shared no confidences relating to his representation of HV with Jaspan, and that Englander and Jaspan adopted measures in September 2003 upon becoming aware of the potential conflict to protect against any breach, we are satisfied that any presumption of shared confidences that may arise by operation of law has been sufficiently rebutted, and conclude the Jaspan firm's continued representation of Valley Stream should be viewed as free of disqualifying taint.
 
 
 C. Contact with a Prospective Client
 
 
 58
 HV also seeks disqualification of the Jaspan firm on the basis of the ten-minute phone conversation between Alessandria and Santemma. It forthrightly acknowledges the weakness of this argument, and an affidavit filed by its attorney explains that she would not have made the motion to disqualify Jaspan based solely on this call. HV nevertheless continues to argue on appeal that Alessandria's contact with Santemma made it a current client of the Jaspan firm during the course of Jaspan's representation of Valley Stream.
 
 
 59
 As a preliminary matter, we question whether the distinction between concurrent representation and successive representation retains much meaning when a prospective client briefly consults with an attorney with a view to possible representation and decides not to retain that attorney. However, we need not, and do not, decide which standard applies. Alessandria's call was not made in his capacity as the owner of HV and did not relate to the subject of this litigation. Disqualification of Camhi and Jaspan is not warranted on the basis of Alessandria's call, whether considered alone or in conjunction with the other facts advanced by HV.
 
 CONCLUSION
 
 60
 We have considered HV's other arguments and find them to be without merit. The judgment is affirmed.
 
 
 
 Notes:
 
 
 [1]
 It is unclear from the record whether Alessandria called Santemma at the Jaspan firm or whether his call was transferred from Santemma's old firm
 
 
 [2]
 HV argues that the prohibition of "enclosed viewing rooms, live peep shows or live performances or similar type activities" should be read as intended to curtail only live shows, carrying an attendant risk of prostitution. It argues that its video viewing booths are too small to accommodate more than one person and fall outside the intended scope of the prohibition. The argument has no merit. While the prohibition was surely intended to curtail prostitution on the premises, there is no reason to conclude it was not also intended to curtail the very activities facilitated by HV's private viewing booths
 
 
 [3]
 The parties dispute whether the doctrine of equitable estoppel is available against a municipality. We express no opinion on this question because, assuming for the sake of argument that Valley Stream could be estopped, estoppel would not be warranted on the facts of this case
 
 
 [4]
 The New York Court of Appeals' decision inCardinale v. Golinello, 43 N.Y.2d 288, 401 N.Y.S.2d 191, 372 N.E.2d 26 (1977), does not indicate a contrary result. There, the firm had asked the "of counsel" attorney to work on the very case in which disqualification was sought, and he had helped prepare the complaint. After his conflict was identified, he attempted to hand the case back to the firm. The court understandably perceived a significant risk of taint and imputed the "of counsel" attorney's conflict to his firm.
 Roberts & Schaefer and Atasi, the two cases purporting to adopt a per se rule requiring attribution of conflicts between an "of counsel" attorney and his firm, are also distinguishable on their facts. In Roberts & Schaefer, a merger announcement listed the attorney as a member of the merged firm. Only later, when a defendant being sued by the attorney refused to waive the firm's conflict, was the attorney's designation changed to "of counsel." The court characterized the change as "little more than a post hoc effort" that came "too late" to shield the attorney from being considered a full member of the firm and having its conflict imputed to him. 898 F.Supp. at 360. In Atasi, the "of counsel" attorney was significantly more integrated into his firm than Englander. The firm provided the attorney with a full-time secretary and backup help when he was overloaded, and it performed all billing for him. 847 F.2d at 831. Unlike Englander, he promised to do "all of his legal work through and in the name of the firm." Id.
 As for Nemet v. Nemet, 112 A.D.2d 359, 491 N.Y.S.2d 810 (N.Y.App.Div.1985), the Appellate Division's reasoning about the appearance of impropriety could be read broadly. The court may have intended to qualify that holding, however, when it wrote that the problem was "evident in the `of counsel' arrangement between these attorneys." Id. at 811 (emphasis added). Without a more detailed statement of facts, it is simply impossible to ascertain the closeness of the relationship between the "of counsel" attorney and the firm, and therefore it is impossible to assess the meaning of Nemet.
 
 
 [5]
 Cheng I involved an appeal from the denial of a motion to disqualify counsel. After the Supreme Court held in Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981), that an order denying a motion to disqualify counsel is not immediately appealable, it granted certiorari in Cheng to vacate the judgment of this court. See GAF Corp. v. Cheng, 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981). On remand, we dismissed the appeal. Cheng v. GAF Corp., 659 F.2d 1058 (2d Cir.1981). Accordingly, Cheng I is not binding precedent, a fact we later recognized. See Cheng v. GAF Corp., 713 F.2d 886, 891 (2d Cir.1983). A number of district courts have nevertheless followed the reasoning of Cheng, especially when adjudicating disqualification motions involving small firms. See, e.g., Marshall v. State of N.Y. Div. of State Police, 952 F.Supp. 103, 112 (N.D.N.Y.1997) (disqualifying fifteen-member firm); Baird v. Hilton Hotel Corp., 771 F.Supp. 24, 25, 27 (E.D.N.Y.1991) (disqualifying nine-member firm).