**MERCK EPROVA AG and Merck KGaA, Plaintiffs,**

v.

**PROTHERA, INC., Defendant.**

No. 08 Civ. 0035(RMB)(JCF).

United States District Court, S.D. New York.

Sept. 17, 2009.

Robert Eliot Hanlon, Thomas Jude Parker, Natalie Christine Clayton, Rowan Elizabeth Morris, Victoria Elizabeth Spataro, Alston & Bird, LLP, New York, NY, for Plaintiffs.

Gregory F. Wilson, Wilson & Quint, LLP, Reno, NV, Joshua King, Graybeal Jackson Halye LLP, Bellevue, WA, Charles Joseph Raubicheck, Frommer, Lawrence & Haug, L.L.P., James Newell Blair, Snow Becker Krauss P.C., New York, NY, for Defendant.

### MEMORANDUM AND ORDER

JAMES C. FRANCIS IV, United States Magistrate Judge.

Plaintiffs Merck KGaA and its Swiss affiliate, Merck Eprova (collectively, "Merck"), allege that defendant ProThera, Inc. ("ProThera") has mislabeled a nutritional supplement that it distributes. According to Merck, ProThera's conduct constitutes direct and contributory false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); contributory trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); trademark dilution in violation of Section 43(c) of the Trademark Dilution Revision Act of 2006 and the Federal Trademark Dilution Act of 1995, 15 U.S.C. § 1125(c); unfair competition in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); unfair competition in violation of New York common law; trademark dilution in violation of Section 360–1 of the New York General Business Law; deceptive trade practice in violation of Section 349(h) of the New York General Business Law; and false advertising in violation of Sections 350 and 350–e(3) of the New York General Business Law. (Complaint ("Compl."), ¶ 1).

Merck now moves to disqualify one of ProThera's counsel, the firm of Frommer Lawrence & Haug LLP ("FLH"), on the ground that this firm has been representing Merck in a related patent prosecution at the same time that it has been litigating against Merck here. Merck further contends that FLH must be disqualified because Dr. Howard Rosenberg, an in-house scientific advisor for FLH, previously worked for Merck and provided advice in connection with the same chemical compound that is at issue here. ProThera opposes the motion, arguing that Merck is not a client of FLH in the patent matter, that the patent prosecution is not substantially related to this case, that disqualification would prejudice ProThera, and that Dr. Rosenberg's relationship with Merck does not warrant disqualification. Furthermore, ProThera contends that because FLH is no longer representing any party in the patent matter, any basis for disqualification has evaporated.

For the reasons that follow, Merck's motion is granted.

*Background*

A. *The Current Litigation*

Merck markets a dietary supplement using trademarks that incorporate the term "Metafolin." (Compl., ¶¶ 8–11). The Metafolin marks are used by Merck in connection with the dietary ingredient N–[4–[[ (2–amino–5,6,7,8–tetrahydro–4–hydroxy–

5–methyl(6S)–pteridinyl)methyl]amino-]benzoyl]–L–glutamic acid, calcium salt. (Compl., ¶ 9). This chemical is otherwise identified as L–5–methyltetrahydrofolic acid, calcium salt ("L–5–MTHF"). (Compl., ¶ 9). L–5–MTHF is a pure diastereoisomeric form of the compound 5–methyltetrahydrofolic acid. (Compl., ¶ 9). L–5–MTHF is a source of folate, a vitamin of the B complex, and has been used in pregnancy vitamins, nutritional supplements, and special dietary and medical foods. (Compl., ¶¶ 10, 11).

The chemical 5–MTHF is a mixture of two diastereoisomers, the "L-form" and the "D-form." (Compl., ¶ 20). The L-form is a naturally occurring form of folate found in food and in the human body and is biologically active, while the D-form is not present in nature and cannot be metabolized in the body. (Compl., ¶ 21). According to Merck, the presence of the D-form could reduce the effectiveness of a folate supplement by competing with the uptake and activity of the beneficial L-form. (Compl., ¶ 23).

Beginning in 2005, Merck supplied L–5–MTHF to ProThera and allowed ProThera to use the Metafolin trademarks pursuant to a license agreement. (Compl., ¶ 36). However, Merck terminated the license in August 2006, allowing ProThera to deplete its inventory over the following month. (Compl., ¶¶ 37–39). Nevertheless, Merck determined that ProThera and some of its distributors were still using the Metafolin marks in 2007. (Compl., ¶ 40). Furthermore, Merck tested products manufactured or distributed by ProThera and discovered that although they were labeled or advertised as containing L–5–MTHF, in fact they contained the diastereoisomeric mixture 5–MTHF (i.e., they contained both the L-form and the D-form). (Compl., ¶ 40).

Merck commenced the instant litigation in January 2008. From the inception of the case, ProThera has been represented by Joshua King of Graybeal Jackson LLP and by local counsel, James N. Blair of Snow Becker Krauss P.C. In November 2008, Gregory Wilson of Wilson & Quint LLP joined as co-counsel. Then, on February 6, 2009, Charles Raubicheck of FLH filed his appearance as additional co-counsel.

### B. *The Patent Proceedings*

On August 1, 2005, Merck Eprova entered into an exclusive license agreement (the "Agreement") with Schering AG, which later became Bayer Schering Pharma AG ("Bayer"). (Declaration of Vera A. Katz dated June 5, 2009 ("Katz Decl."), ¶ 3 & Exh. A). The purpose of the Agreement was to facilitate joint development of new pharmaceutical products that include L–5–MTHF. (Katz Decl., ¶ 4). In that connection, the Agreement made provision for prosecution of a joint patent:

> [Bayer] shall direct and control the preparation, filing and prosecution of the patent applications with respect to the Joint Patent (including any interferences and foreign oppositions) in the name of [Merck Eprova] and [Bayer]. . . . [Merck Eprova] shall provide to [Bayer] appropriate powers of attorney to enable [Bayer] to act on behalf of [Merck Eprova] before the patent authorities with respect to the Joint Patent. . . . In the event that [Bayer] declines or fails to file any patent application with respect to the Joint Patent in the Territory, or intends to abandon all patent applications without filing a continuation of such patent applications, [Bayer] shall provide [Merck Eprova] a reasonable opportunity to file and/or to prosecute such patent application on [Merck Eprova's] behalf.

(Katz Decl., Exh. A at 17). The Agreement further provides that "[e]ach Party

shall keep the other Party informed with regard to the patent application and maintenance processes ... and shall promptly deliver to the other Party copies of all patent applications, amendments, related correspondence and other relevant materials." (Katz Decl., Exh. A at 17).

Pursuant to the Agreement, Merck Eprova and Bayer filed two joint patent applications, U.S. Patent Application Nos. 11/435,198 and 11/938,688. (Declaration of Rudolf Moser dated June 5, 2009 ("Moser Decl."), ¶ 4 & Exh. A). The claimed inventions relate to pharmaceuticals that combine estrogens or progestogens with L–5–MTHF for use as an oral contraceptive. For purposes of prosecuting these pending patent applications, Bayer engaged Thomas J. Kowalski of FLH, which had long represented it in patent matters, including patents over which the current applications claim priority. (Declaration of Thomas J. Kowalski dated June 18, 2009 ("Kowalski Decl."), ¶¶ 4–5, 8–9).

According to FLH, it represented Bayer exclusively in connection with the pending applications. FLH received compensation only from Bayer and not from Merck. (Kowalski Decl., ¶¶ 3, 30–31). It took direction only from Bayer and not from Merck. (Kowalski Decl., ¶ 40). And, it communicated only with Bayer and not with Merck. (Kowalski Decl., ¶¶ 3, 29, 31, 46).

Merck Eprova, on the other hand, always understood that FLH represented it as well as Bayer in connection with the pending applications. (Katz Decl., ¶ 10). Because of their joint interest, Merck communicates with Bayer regarding any patent applications arising from the Agreement, "discussing, for instance, communications they have received from patent attorneys in different countries where the applications have been filed." (Katz Decl., ¶ 12). One of the inventors identified in the pending applications, Dr. Rudolf Moser, is a Merck employee from whom FLH obtained a power of attorney in connection with the applications. (Moser Decl., ¶¶ 1, 3, 8–9 & Exh. B). Dr. Moser also executed an assignment of his rights in the invention to Merck and Bayer jointly. (Moser Decl., ¶ 10 & Exh. C).

Bayer, too, believed that FLH represented Merck. When Bayer became aware of the current dispute, it sent a letter to FLH that states in part:

> As you know, Merck Eprova was co-assignee when we filed the ... patent applications and still is today.... We were surprised to hear that you do not consider Merck Eprova as your client. We are no experts in U.S. patent law, but in the European system, in such a case, the representative of one patent owner would automatically be the representative of all patent owners. When we communicated with you about these applications, it was on behalf of both us and Merck Eprova.

(Letter from Uwe Hartmann and Andreas Brösamle to Thomas Kowalski dated June 26, 2009 ("Hartmann Letter"), attached as Exh. A to Declaration of Andreas Furger dated June 26, 2009 ("Furger Decl."), at 1).

Bayer expressed concern about the relationship between the patent applications and the instant litigation. It told FLH that "Merck Eprova informed us that the subject matter of their litigation against Prothera [sic] is not a pure trademark matter but the question of which substance can be labelled [sic] as L–5–MTHF. Metafolin (L–5–MTHF) is an essential part of the inventions claimed in our patent applications." (Hartmann Letter at 1). This anxiety led Bayer to terminate FLH as counsel on the patent applications:

> We are concerned that subject matter discussed in the Prothera [sic] case is related to the ... patent applications and may be adverse to them. We are

not a party to this litigation and have no interest in being involved in it. Our sole interest here is to safeguard our IP rights. Therefore, we decided to transfer the . . . patent applications to another law firm. Merck Eprova agreed to that transfer. Please stop working on these applications and wait for our transfer instruction which we will send to you soon.

(Hartmann Letter at 2).

## C. *The Role of Dr. Rosenberg*

Dr. Rosenberg holds a Ph.D. degree in pharmacology. (Declaration of Howard E. Rosenberg dated June 11, 2009 ("Rosenberg Decl."), ¶ 2). From 1986 through 2008, he was employed by Generics (UK) Ltd., a member of the Merck Generics Group, which in turn was a subsidiary of Merck KGaA. (Rosenberg Decl., ¶ 3). According to Dr. Rosenberg, his "work focused on research and development of generic pharmaceuticals, and the intellectual property landscape surrounding generic products." (Rosenberg Decl., ¶ 3). In that capacity, he "was involved in aspects of chemical synthesis, development, and patentability of active ingredients used in generic pharmaceutical products." (Rosenberg Decl., ¶ 3). Dr. Rosenberg characterizes his involvement with L–5–MTHF as limited:

While at Merck Generics, I had a few occasional discussions with Dr. Martin Ulmann, an employee of Merck Eprova AG (another subsidiary of Merck KGaA) concerning the folate compound L–5–MTHF. Dr. Ulmann was directing a project seeking to develop this compound for commercial purposes. . . . At his request, I commented to Dr. Ulmann about the possibility of obtaining patents for L–5–MTHF. I did not draft any claims in an patent application for this compound. I was not an inventor named in any patent applications. I had no decision-making responsibility nor

any role in filing patent applications for this compound.

(Rosenberg Decl., ¶¶ 4–5).

Merck views Dr. Rosenberg's role in connection with L–5–MTHF as more extensive:

During his tenure at Merck, Dr. Rosenberg assisted in the development of Merck's intellectual property strategies, including Merck Eprova's strategies for L–5–MTHF. In fact, as part of this strategic planning, Dr. Rosenberg visited Merck Eprova's L–5–MTHF plant in Switzerland and, on more than one occasion, consulted with Merck Eprova regarding the [intellectual property] protection strategy for L–5–MTHF in the United States and elsewhere. This involvement included Dr. Rosenberg's assisting in the drafting of claims for patent applications related to L–5–MTHF. Dr. Rosenberg also engaged in many conversations with Merck Eprova's managing director, Martin Ulmann, relating to possible protection strategies for Merck's L–5–MTHF product.

(Katz Decl., ¶ 17). In support of its characterization, Merck points to an e-mail that Dr. Rosenberg sent in response to a notice of a meeting that he attended concerning amendments to patent claims for L–5–MTHF. (Furger Decl., ¶¶ 7–9). In that e-mail, Dr. Rosenberg indicated that he had reviewed the patent application and had questions concerning the forms of the compound and about whether Merck wished to claim each form separately. He stated that he would prefer to "talk it through" in the face-to-face meeting and discuss Merck's objective and what it intended to protect. (Furger Decl., Exh. B).

In January 2009, Dr. Rosenberg was hired as a scientific advisor for FLH. (Rosenberg Decl., ¶ 1). Since that time, he has had no substantive involvement with any matter concerning L–5–MTHF, in-

cluding the instant lawsuit. (Rosenberg Decl., ¶ 7). He has not communicated with FLH attorneys about the merits of the ProThera litigation; he has not reviewed any documents relating to it (with the exception of a redacted copy of the present disqualification motion); and he no longer possesses any documents concerning Merck's work with L–5–MTHF. (Rosenberg Decl., ¶¶ 8, 9, 11). Dr. Rosenberg represents that he will not participate in the ProThera lawsuit in any way. (Rosenberg Decl., ¶ 12).

*Discussion*

### A. *Principles of Disqualification*

■ Motions to disqualify counsel are viewed with disfavor and subjected to a high standard of proof, in large part because they can be used as a litigation tactic. *See Evans v. Artek Systems Corp.,* 715 F.2d 788, 791–92 (2d Cir.1983) (noting "high standard of proof" for disqualification motions because they are "often interposed for tactical reasons"); *Leslie Dick Worldwide, Ltd. v. Soros,* No. 08 Civ. 7900, 2009 WL 2190207, at *6 (S.D.N.Y. July 22, 2009); *Medical Diagnostic Imaging, PLLC v. CareCore National, LLC,* 542 F.Supp.2d 296, 306–07 (S.D.N.Y.2008); *Ello v. Singh,* No. 05 Civ. 9625, 2006 WL 2270871, at *2 (S.D.N.Y. Aug. 7, 2006); *In re Motion to Quash Deposition Subpoena to Lance Wagar,* No. 1:06–MC–127, 2006 WL 3699544, at *8, 10 (N.D.N.Y. Dec. 13, 2006). Indeed, even when brought in good faith, a motion to disqualify can delay liti-

gation, impose additional expense, and interfere with the attorney-client relationship. *Ello,* 2006 WL 2270871, at *2 (citing cases). On the other hand, the Second Circuit has held that any doubt should be resolved in favor of disqualification. *Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.1975); *see also Bowens v. Atlantic Maintenance Corp.,* 546 F.Supp.2d 55, 86 (E.D.N.Y.2008); *Blue Planet Software, Inc. v. Games International, LLC,* 331 F.Supp.2d 273, 275 (S.D.N.Y.2004). The apparent tension between these principles arises from the need "to balance 'a client's right freely to choose his counsel' against 'the need to maintain the highest standards of the profession.'" *Hempstead Video, Inc. v. Incorporated Village of Valley Stream,* 409 F.3d 127, 132 (2d Cir.2005) (quoting *Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 739 (2d Cir. 1978)).

■ The authority to disqualify an attorney is a function of the court's inherent supervisory power. *See id.; Medical Diagnostic Imaging,* 542 F.Supp.2d at 305– 06; *Skidmore v. Warburg Dillon Read LLC,* No. 99 Civ. 10525, 2001 WL 504876, at *2 (S.D.N.Y. May 11, 2001). Consequently, although courts look to the American Bar Association Model Rules of Professional Conduct (the "Model Rules") and to state disciplinary rules for guidance,[1] these rules are not binding. *See Hempstead Video,* 409 F.3d at 132; *Medical Diagnostic Imaging,* 542 F.Supp.2d at

---

1. Previously, lawyers in New York were subject to the New York Code of Professional Responsibility and its Disciplinary Rules (the "Old Rules"), which were based in turn on the American Bar Association Model Code of Professional Responsibility (the "Model Code"). In 1983, the ABA replaced its Model Code with the Model Rules, but New York did not immediately adopt the Model Rules. Instead, New York retained the Old Rules until April 1, 2009, when it replaced them with the New York Rules of Professional Conduct (the

"New Rules"). N.Y. Comp.Codes R. & Regs. tit. 22, § 1200 *et seq.* (2009); *see Leslie Dick,* 2009 WL 2190207, at *5 n. 14. Although the New Rules conform in format to the Model Rules, New York has retained the substance of some of the Old Rules, even where they deviate from the Model Rules. For ease of reference, I will refer here both to the New Rules and to the Old Rules, since the latter are cited in all cases decided before the adoption of the New Rules.

305–06; *Blue Planet Software*, 331 F.Supp.2d at 275; *Skidmore*, 2001 WL 504876, at *2. Accordingly, "not every violation of a disciplinary rule will necessarily lead to disqualification," *Hempstead Video*, 409 F.3d at 132, and, conversely, disqualification may be justified even in the absence of a clear ethical breach "where necessary to preserve the integrity of the adversary process...." *Board of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979).

■ Disqualification is warranted where an attorney's conduct tends to taint the underlying proceedings. *See Hempstead Video*, 409 F.3d at 132–33; *Nyquist*, 590 F.2d at 1246; *Leslie Dick*, 2009 WL 2190207, at *7; *In re MTBE Products Liability Litigation*, 438 F.Supp.2d 305, 307–09 (S.D.N.Y.2006). There are at least two ethical obligations which, if violated, would create a risk of taint. The first is the requirement that an attorney exercise independent judgment on behalf of a client. This obligation is now embodied in Rule 1.7 of the New York Rules of Professional Conduct, which states in pertinent part that

> a lawyer shall not represent a client if a reasonable lawyer would conclude that either:
>
> (1) the representation will involve the lawyer in representing differing interests; or
>
> (2) there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests.

Rule 1.7(a).[2] The second relevant ethical requirement is that an attorney maintain client confidences. This obligation is contained in Rule 1.6, which states in part that "A lawyer shall not knowingly reveal confidential information ... or use such information to the disadvantage of a client or for the advantage of the lawyer or a third person[.]" Rule 1.6(a).[3]

■ Where a conflict is alleged, "[t]he standard for disqualification varies depending on whether the representation is concurrent or successive." *Hempstead Video*, 409 F.3d at 133. If the representation is concurrent, it is " 'prima facie improper' for an attorney to simultaneously represent a client and another party with interests directly adverse to that client." *Id.* (quoting *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir.1976)). In such instances, the "per se" standard applies and the attorney must be disqualified unless he can demonstrate " 'at the very least, that there will be no actual or *apparent* conflict in loyalties or diminution in the vigor of his representation.' " *Id.* (quoting *Cinema 5*, 528 F.2d at 1387).

■ In a case of successive representation, an attorney may be disqualified where:

> (1) the moving party is a former client of the adverse party's counsel;
>
> (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and
>
> (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Id.* (quoting *Evans*, 715 F.2d at 791); *see also Blue Planet Software*, 331 F.Supp.2d at 275–78.

---

**2.** This rule is substantively similar to Canon 5, Disciplinary Rule ("DR") 5–105(A)–(B), and DR 5–101 of the Old Rules.

**3.** This is analogous to Canon 4 and DR 4–101 of the Old Rules.

## B. Dual Representation

### 1. Termination of Representation

As noted above, FLH's responsibility for the patent applications was terminated when Bayer transferred that assignment to other counsel on June 26, 2009. (Furger Decl., Exh. A). According to ProThera, this "makes it crystal clear that the basis for Merck's motion has vanished. Assuming solely for argument's sake that Merck had an attorney-client relationship with FLH, it has now gone with the transfer." (ProThera's Sur–Reply Memorandum Opposing Merck's Motion to Disqualify Frommer Lawrence & Haug LLP as its Counsel ("ProThera Sur–Reply") at 6). However, if there had been an attorney-client relationship between Merck and FLH, the termination of that relationship would not end the disqualification inquiry altogether. At the very least, the potential conflict would have to be analyzed under the standards for successive representation.

■ And, indeed, where counsel have simultaneously represented clients with differing interests, the standard for concurrent representation applies even if the representation ceases prior to the filing of a disqualification motion. *Unified Sewerage Agency of Washington County, Oregon v. Jelco Inc.,* 646 F.2d 1339, 1345 n. 4 (9th Cir.1981); *Anderson v. Nassau County Department of Corrections,* 376 F.Supp.2d 294, 298–99 (E.D.N.Y.2005) ("[T]he status of the relationship is assessed at the time that the conflict arises."); *Ehrich v. Binghamton City School District,* 210 F.R.D. 17, 25 (N.D.N.Y.2002); *Chemical Bank v. Affiliated FM Insurance Co.,* No. 87 Civ. 150, 1994 WL 141951, at *11 (S.D.N.Y. April 20, 1994); *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 435 F.Supp. 84, 95 (S.D.N.Y.), *aff'd in part and rev'd in part on other grounds,* 567 F.2d 225 (2d Cir. 1977); *see generally* Kenneth R. Adamo, *Attorney Disqualification in Patent Litigation,* 1 Alb. L.J. Sci. & Tech. 177, 194–98 (1991). This principle is based on the rationale that "if the rule was otherwise, an 'attorney could always convert a present client into a "former client" by choosing when to cease to represent the disfavored client.'" *Ehrich,* 210 F.R.D. at 25 (quoting *Unified Sewerage,* 646 F.2d at 1345 n. 4); *see also Chemical Bank,* 1994 WL 141951, at *11. More colloquially, this is referred to as the "hot potato" rule, which holds that counsel may not avoid a disqualifying conflict by dropping the less desirable client like a "hot potato." *See Abubakar v. County of Solano,* No. Civ. S–06–2268, 2008 WL 336727, at *4 (E.D.Cal. Feb. 4, 2008); *ValuePart, Inc. v. Clements,* No. 06 C 2709, 2006 WL 2252541, at *2 (N.D.Ill. Aug. 2, 2006); *Universal City Studios, Inc. v. Reimerdes,* 98 F.Supp.2d 449, 453 (S.D.N.Y.2000); *Chemical Bank,* 1994 WL 141951, at *11; *Picker International Inc. v. Varian Associates, Inc.,* 670 F.Supp. 1363, 1365–66 (N.D.Ohio 1987), *aff'd,* 869 F.2d 578 (Fed.Cir.1989).

■ ProThera seems to suggest that such reasoning does not apply here because, rather than seeking to withdraw from representing Merck, FLH was terminated. (ProThera Sur–Reply at 6 n. 4). But the rule requiring a conflict to be judged by the concurrent representation standard even after representation has ended should not turn on whether representation is terminated by conflicted counsel or by the client. Otherwise, counsel could simply persist in dual representation until one client or the other capitulates. Counsel should not be rewarded for delaying resolution of a conflict issue by being accorded a less demanding disqualification standard. Accordingly, the higher standard for concurrent representation applies in this case.

## 2. The Attorney–Client Relationship

■ The appropriate standard of analysis depends not only on whether the representation is concurrent or successive, but also on the quality of the attorney-client relationship. A strict standard "is properly imposed when a lawyer undertakes to represent two adverse parties, both of which are his clients in the traditional sense." *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 749 (2d Cir.1981). Where the attorney-client relationship is attenuated, it may be appropriate to use a more relaxed standard. Thus, in *Glueck*, the court determined that the substantial relationship test would apply to whether the law firm representing an association could also represent a party in a case against an association member. *Id.* at 749–50; *see also British Airways, PLC v. Port Authority of New York and New Jersey*, 862 F.Supp. 889, 894–95 (E.D.N.Y.1994) (finding that "courts in this circuit will apply the 'substantial relationship' test, and will shun the per se or prima facie standard, when the client seeking disqualification is only a 'vicarious' client"); *Chemical Bank*, 1994 WL 141951, at *18 (applying substantial relationship test where representation did not amount to "traditional" attorney-client relationship).

■ "The formation of an attorney-client relationship hinges upon the client's [reasonable] belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." *Diversified Group, Inc. v. Daugerdas*, 139 F.Supp.2d 445, 454 (S.D.N.Y.2001) (internal quotation marks and citation omitted); *see also Knigge v. Corvese*, No. 01 Civ. 5743, 2001 WL 830669, at *3 (S.D.N.Y. July 23, 2001). No special formality is required to demonstrate the establishment of the relationship. *See Knigge*, 2001 WL 830669, at *3; *Catizone v. Wolff*, 71 F.Supp.2d 365, 368 (S.D.N.Y.1999). Rather, courts in this jurisdiction have generally relied on six factors to determine whether an attorney-client relationship exists:

1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; 4) whether the attorney actually represented the individual in one aspect of the matter (e.g., at a deposition); 5) whether the attorney excluded the individual from some aspect of [the] litigation in order to protect another (or a) client's interest; 6) whether the purported client believes that the attorney was representing him and whether this belief is reasonable.

*Medical Diagnostic Imaging*, 542 F.Supp.2d at 307 (quoting *First Hawaiian Bank v. Russell & Volkening, Inc.*, 861 F.Supp. 233, 238 (S.D.N.Y.1994)); *see also Leslie Dick*, 2009 WL 2190207, at *8 (citing same six-factor test). Here, ProThera contends that there was no traditional attorney-client relationship between Merck and FLH and that the per se test for disqualification therefore does not apply. (Memorandum of Law in Opposition to Merck's Motion to Disqualify Frommer Lawrence & Haug LLP as Counsel for Defendant ProThera ("Def. Memo.") at 9–10).

But ProThera's argument fails to take into account how this test must be construed in the context of joint representation. *See In re Regents of University of California*, 101 F.3d 1386, 1389 (Fed.Cir. 1996) ("When the same attorney represents the interest of two or more entities on the same matter, those represented are viewed as joint clients for the purposes of privilege."); *American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Alcoa Steamship Co.*, 232

F.R.D. 191, 197–98 (S.D.N.Y.2005) (discussing cases finding corporate directors to be joint clients); *Jordan (Bermuda) Investment Co. v. Hunter Green Investments Ltd.*, No. 00 Civ. 9214, 2005 WL 525447, at *1 (S.D.N.Y. March 4, 2005) (finding no waiver of privilege where information shared among joint clients); *Bass Public Ltd. v. Promus Cos.*, No. 92 Civ. 969, 1994 WL 9680, at *8 (S.D.N.Y. Jan. 10, 1994) (finding pre-merger entities to be joint clients of law firm); *Zackiva Communications Corp. v. Milberg Weiss Bershad Specthrie & Lerach*, 1995 WL 131847, at *2 (N.Y.Sup.Ct. Jan. 26, 1995) (slip op.) (discussing privilege as between shareholders as joint clients of firm). Where counsel is engaged by two or more clients to represent them jointly in a matter, it is unrealistic to expect that each client will necessarily execute a separate retainer agreement, communicate with counsel independently, or provide individual payment for services rendered. It is at least equally likely that one representative will interact with the attorney on behalf of all of the clients. Where, for example, a husband and wife are engaged in a transaction with a third party concerning marital property, an attorney would generally understand that she represents both spouses, even if only one deals with the attorney in connection with the matter. Where one spouse establishes and effectuates the attorney-client relationship, it is understood that this is done on behalf of the other as well.

 Likewise, where two parties are jointly prosecuting a patent application, they are commonly considered to be joint clients. *See Beasley v. Avery Dennison Corp.*, No. SA–04–CA–0866, 2006 WL 2854396, at *4 (W.D.Tex. Oct. 4, 2006); *Hillerich & Bradsby Co. v. MacKay*, 26 F.Supp.2d 124, 126 (D.D.C.1998).

> Courts have long recognized the existence of the attorney-client relationship among clients and attorneys allied in a common legal cause. Typically, parties jointly developing a patent with an attorney commonly have a "common legal interest" in obtaining the greatest protection and in exploiting the patents. The parties thereby develop a "community of interest," which establishes a joint attorney-client relationship among them and the attorney. In this respect, when a community of interest exists, courts have viewed those represented as "joint clients" for the purpose of privilege.

*Hillerich & Bradsby*, 26 F.Supp.2d at 126 (citations omitted).[4]

 Here, there is no dispute that Bayer and Merck intended to file joint patent applications and that Bayer engaged FLH to prosecute those applications. It was therefore reasonable for

---

4. Unfortunately, joint representation is frequently confused with the "common interest" doctrine, also known as the "joint defense" doctrine. *See Jordan (Bermuda) Investment Co.*, 2005 WL 525447, at *1 (distinguishing joint representation from common interest doctrine); 24 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5505 at 555–56 (1986) (discussing distinction). The common interest doctrine "permits the disclosure of a privileged communication without waiver of the privilege provided the party claiming an exception to waiver demonstrates that the parties communicating: (1) have a common legal, rather than commercial, interest; and (2) the disclosures are made in the course of formulating a common legal strategy." *Sokol v. Wyeth, Inc.*, No. 07 Civ. 8442, 2008 WL 3166662, at *5 (S.D.N.Y. Aug. 4, 2008) (citing *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y.1995)). In such a situation, the parties are not joint clients and may have separate counsel. This confusion does not detract, however, from the general principle that parties may, and often do, elect joint representation, specifically in the context of the joint ownership of patents.

Bayer and Merck to understand that they were joint clients of FLH even though Bayer alone dealt with FLH, who had represented it in prior matters. When Bayer communicated with FLH, it did so on behalf both of itself and of Merck. (Hartmann Letter at 1). As substantive examination of the patent applications began, Merck anticipated further communications with Bayer and also with FLH directly. (Katz Decl., ¶¶ 13–14). Dr. Moser, one of the inventors and an employee of Merck, provided to FLH a power of attorney and an assignment of his rights to Bayer and Merck to be used in connection with the applications. (Moser Decl., ¶¶ 8–10).[5]

The cases cited by ProThera do not undermine the conclusion that there was joint representation. In both *Sun Studs*, 772 F.2d at 1567–69, and *Comtech*, 1986 WL 6829, at *1–3, for example, the court found that there was no conflict of interest when a firm that had represented an assignee in a patent application subsequently represented the assignee against the inventors who had assigned their rights. In neither of those cases, however, were inventors co-owners of the patents, as Bayer and Merck are here. *See Sun Studs*, 772 F.2d at 1564 (noting that title to all patents was assigned to Sun Studs); *Comtech*, 1986 WL 6829, at *1 (finding that inventors assigned all rights to Comtech). Those cases, therefore, provide no guidance with respect to the issue of joint representation for co-owners of patent rights.

Bayer and Merck, then, were both clients of FLH "in the traditional sense." *Chemical Bank*, 1994 WL 141951, at *13.

Accordingly, the per se rule applies, and FLH must be disqualified unless it can demonstrate that there is "no actual or apparent conflict in loyalties" and that the vigor of its representation would not be diminished. *Hempstead Video*, 409 F.3d at 133 (quoting *Cinema 5*, 528 F.2d at 1387). This it cannot do, primarily because of the close connection between the subject matter of the patent application and this litigation.

### 3. *Potential Taint*

■ The gravamen of Merck's complaint in this case is that ProThera mislabels its product as L–5–MTHF when, in fact, it is the diastereoisomeric mixture, 5–MTHF, and therefore unfairly competes with Merck's Metafolin product, which is "pure" L–5–MTHF. Accordingly, even though this is an unfair competition case, the therapeutic characteristics of these compounds are central to the claims. The uniqueness of L–5–MTHF is an important element of Merck's argument that its product and ProThera's are distinct in material ways and that ProThera's labeling is therefore misleading. So too, the unique properties of L–5–MTHF are critical to the patent applications. Its characteristics are plainly relevant to the patent claims asserted and the ultimate patentability of the drugs for which Merck and Bayer seek patent protection.

This highlights the conflicted position in which FLH finds itself. On one hand, in the patent prosecution, it is in the interest of Merck (as represented by FLH) to establish that only L–5–MTHF can serve certain therapeutic purposes. On the other hand, in this litigation, ProThera (also

---

**5.** Provision of the power of attorney did not, by itself, create any attorney-client relationship between Merck and FLH. *See Sun Studs, Inc. v. Applied Theory Associates, Inc.*, 772 F.2d 1557, 1568 (Fed.Cir.1985); *Comtech, Inc. v. Reuter*, No. 86 CV 0478, 1986 WL 6829, at *2 (E.D.N.Y. March 18, 1986). However, the power of attorney, along with the assignment of rights by a Merck employee to both Bayer and Merck, should have been an indication to FLH that FLH was acting on behalf of both co-owners.

represented by FLH) argues that 5–MTHF is interchangeable with L–5–MTHF except with respect to dosage since, in its view, the D–5–MTHF component in 5–MTHF is inert.

The close relationship between the patent prosecution and this case has two significant legal consequences. First, ProThera cannot establish the necessary predicate for escaping disqualification under the per se rule. Second, even if the per se rule did not apply because FLH's representation of Merck is considered merely indirect or attenuated, disqualification would still be appropriate because of the substantial nexus between the matters in which FLH represents adverse interests. *See British Airways,* 862 F.Supp. at 894–95; *Chemical Bank,* 1994 WL 141951, at *18.

### 4. Remaining Considerations

■ In the absence of a direct conflict of interest, courts may exercise discretion in determining whether to disqualify counsel on the basis of a violation of ethical principles. *See Purgess v. Sharrock,* 33 F.3d 134, 144 (2d Cir.1994) (finding disqualification discretionary in context of lawyer's statement being presented as evidence); *Evans,* 715 F.2d at 791 (stating that Second Circuit has not hesitated to disqualify counsel "when the circumstances warranted it"); *Blue Planet Software,* 331 F.Supp.2d at 277. However, where the per se rule applies, as it does here, that discretion, if it exists at all, is narrowly confined. Nevertheless, I will address the factors that would inform the exercise of any discretion here.

#### a. Tactical Advantage

ProThera argues that Merck's motion should be denied because it was interposed for tactical reasons, as demonstrated by the timing of the motion and the absence of any taint arising from the dual representation. (Def. Memo. at 18–20).

Merck's motion was indeed somewhat delayed. Based on the imputed knowledge of its counsel, Merck learned on February 6, 2009 that FLH was representing ProThera in this case. And, of course, Merck knew at that time that FLH was also representing it in the patent applications. Yet, it did not advise FLH of its intention to file the instant motion until May 8, 2009.

■ There is, however, an entirely reasonable explanation for this delay. While Merck's counsel immediately became aware of FLH's representation of ProThera, that counsel had no reason to know that FLH was simultaneously representing Merck in the patent proceedings. (Furger Decl., ¶ 13). On the other hand, business executives at Merck knew that FLH was prosecuting the patents but did not realize that FLH had undertaken representation of ProThera. (Furger Decl., ¶ 13). Only when an attorney for Merck in this proceeding discovered that FLH had listed Merck as a client on its website, did counsel engage in the research necessary to identify the conflict. (Declaration of Robert E. Hanlon dated June 5, 2009, ¶¶ 7–8). The delay, then, is not indicative of sharp tactics.

Likewise, tactical motivations cannot be inferred from an absence of taint in the proceedings thus far. As discussed above, the significant relationship between the patent applications and this litigation make it likely that dual representation would indeed taint these proceedings.

#### b. Prejudice

■ ProThera will, of course, suffer some additional cost and delay if FLH is disqualified. Certain factors, however, mitigate that prejudice. First, FLH only recently appeared in this case; this is not a situation where counsel who have been the exclusive attorneys throughout a litigation are disqualified on the eve of trial. Second, while ProThera expresses concern

that it is being deprived of counsel who are expert in the law of trademark and unfair competition, Joshua King of Graybeal Jackson LLP, who has represented ProThera since the inception of the case, also specializes in this subject matter. (Declaration of Robert E. Hanlon dated June 26, 2009, ¶ 3 & Exh. A). Third, to the extent that ProThera requires additional time to engage additional counsel, it will be granted that consideration.

Thus, even if these considerations are properly addressed in a case of a direct conflict, they do not overcome the factors favoring disqualification in this instance.

### C. *Status of Dr. Rosenberg*

In view of the fact that disqualification is warranted on the basis of dual representation by FLH, there is no need to address Dr. Rosenberg's status as a scientific advisor for FLH.

### *Conclusion*

For the reasons set forth above, Merck's motion is granted, and FLH is relieved as counsel for ProThera.

SO ORDERED.