**Michael MINESS, Plaintiff,**

v.

**Surinder AHUJA, Veena Ahuja, Sanjay Ahuja, The Ahuja Family Trust, Namita Mohan, and Vanita Mudgil, Defendants.**

No. 09–cv–2794 (ADS)(WDW).

United States District Court,
E.D. New York.

July 31, 2010.

Jeffrey L. Rosenberg & Associates, LLC, by Jeffrey L. Rosenberg, Esq., of Counsel, Old Westbury, NY, Attorneys for the plaintiff.

Michael B. Schulman & Associates, P.C., by Michael B. Schulman, Esq., of Counsel,

Melville, NY, Attorneys for the defendants.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This case arises out of a dispute concerning the sale of two nursing homes located on the North Shore of Long Island. Presently before the Court is a motion by the plaintiff to disqualify the defendants' counsel, Michael B. Schulman, Esq. For the reasons that follow, the Court grants this motion, and disqualifies Attorney Schulman. In addition, the Court stays the present action for thirty days to afford the defendants the opportunity to retain new counsel.

## I. BACKGROUND

The details of the plaintiff's allegations in this case are set forth in the Court's previous decision in this matter, *Miness v. Ahuja*, 713 F.Supp.2d 161 (E.D.N.Y.2010) ("*Miness I*"). Familiarity with that case is assumed. In brief, plaintiff Michael Miness owned a nursing home business with facilities in Port Jefferson and Glen Cove, New York, which he sold to the defendants prior to filing this case. Upon purchasing the business, the defendants retained Miness as a consultant, but discharged him after only a few months of work for failing to maintain the level of facility occupancy required by his contract. Miness filed this suit on July 1, 2009, alleging that the defendants coerced him into accepting unfavorable terms for his employment, and fraudulently induced him to sell the business by misrepresenting their intention to improve the facilities.

On October 22, 2009, the plaintiff moved to disqualify counsel for the defendants, Michael Schulman, Esq. In *Miness I*, the Court briefly discussed this issue, and found that there were material issues of disputed fact. The Court therefore scheduled an evidentiary hearing, which was ultimately held on June 25 and 29, 2010. Having considered the evidence offered at that hearing, the Court now grants the plaintiff's motion to disqualify.

## II. THE EVIDENTIARY HEARING

### A. The Case of the Plaintiff Michael Miness

Michael Miness previously owned two health care facilities, one in Glen Cove and the other in Port Jefferson. Each facility had an operating company and a real estate company. Each operating company had a lease with the related real estate company. Each was a separate corporation. Miness sold the stock in the four corporations to the defendants in this action. These health facilities combined subacute care and long term care. Miness testified that his companies had significant financial problems. Although he invested well over one million dollars into the companies, they needed to be renovated to stay competitive; and it only postponed the inevitable. He was losing money on the ventures. The defendants promised to infuse cash and do an immediate renovation of the two buildings on the Glengariff facilities. In exchange, Miness promised to spend the next four or five years assisting the defendants' son Sanjay in learning about the medical care provided.

In these four stock purchase agreements, Miness was represented by the Crowe, Deegan law firm, with Francis Deegan as the lead attorney. He had a long term relationship with the Deegan firm. They had been his personal attorneys for 20 years or more. He had great confidence and trust in the Deegan firm.

As to Michael Schulman, Miness believed that he was a friend of his for the last 12 years.

Q. Where did that friendship being and grow?

A. It began—I met him at Old Westbury. We played golf every Saturday and Sunday for at least ten years. In the latter two years he had some illnesses and change in life circumstances, so he generally played one weekend day. But we often played two times a week, maybe more, or spoke, and virtually had breakfast Saturday and Sunday for ten years.

Q. Would you say you were good, close friends?

A. Yes. We shared a lot of intimate information together, both ways.

Q. Would you say he was among your closest friends and you were among his closest friends?

A. I believe so.

Q. In the course of that golfing and social relationship, did Mr. Schulman tell you anything about his business?

A. Certainly. We discussed everybody's business in the foursome, and we did that on a regular basis, almost every weekend.

Q. Did he tell you anything about his cash flow situation in his business?

MR. SCHULMAN: Objection, your Honor.

THE COURT: Overruled.

A. The answer was yes. At one point he had a significant cash-flow problem.

(Transcript of evidentiary hearing held June 25 and 29, 2010 (hereinafter "Tr.") at 16, 17.)

Schulman told Miness that he was an attorney and "that he represents business interests, in certain cases a lot of negligence, contingency-type stuff and divorces, some real estate." (Tr. at 16.) In 2007 Schulman told Miness that he couldn't pay his bills because of his cash-flow problems. Schulman asked to borrow $10,000 from Miness and Miness loaned him $10,000 without a promissory note or interest or a due date. Schulman did repay the $10,000 loan from Miness.

Q. So you made a loan to Mr. Schulman for $10,000 without any evidence of a loan and without any obligation in writing when and where he would pay it back; is that correct?

A. He was my friend. Yes.

(Tr. at 19.)

Prior to 2008, in the course of their golf and social relationship, in the earlier years, Schulman did not solicit him to be retained as his attorney. However, he often referred to the fact that he was there if Miness needed him and could provide collection services for his business. This key testimony was as follows:

Q. In the course of your golf and social relationship in the early years—and now I'm talking about all times before 2008—did Mr. Schulman ever solicit you to have you retain him as an attorney?

A. No. He often discussed what services were available, certain things that we discussed that I had needs for, but I would say that he just simply referred to the fact that he was there if I ever needed him.

Q. Did he ever suggest to you that he could provide collection services for your business?

A. Yes, he could provide that service. He often described—because I had

cash-flow problems in collections in my business. But I chose not to use him.

Q. And why was that?

A. A number of issues. We had used one firm, and then we brought in other people who specialized in collection. That's all they did. And I thought that was a better match for us at the time.

(Tr. at 19–20.)

In July 2007, Miness signed the contract with regard to the sale of the stock of the four nursing home companies. Prior to the execution of those agreements, Miness described his conversations and his relationship with Schulman.

Q. And prior to that execution of the stock purchase agreements, did you generally discuss the fact that you were negotiating for the sale of your business in your regular golf game with Mr. Schulman and others?

A. The answer is absolutely yes. I—it was not just golf games. That's mischaracterizations. We had breakfast Saturday and Sunday, out socially Friday and Saturday nights. It was a much more extensive relationship than a casual golf game once a week.

(Tr. at 20.)

However, Miness also testified that these discussions were made in general in regard to what he was doing in his business life. Schulman knew that Miness was having financial problems, was meeting with several different groups and "eventually selected the Ahujas to do the deal with." (Tr. at 20.) These were general discussions sometimes in the presence of wives and other friends. This included his golf companion and friend Howard Ger-showitz, a Dr. Patel and "about eight or nine people that rotated." (Tr. at 22.)

In the last two years, Schulman played less than every weekend because he had some physical problems and they substituted other players on those occasions. In their discussions, Schulman knew he was represented by the Deegan law firm. Schulman knew attorney Deegan and knew that the Miness family had a long-term relationship with Deegan. Miness testified that up to that point, in those earlier discussions, he did not have the impression that Schulman was trying to supplant Deegan as his lawyer.

In May 2008, the Ahujas began to put pressure on Miness to enter into an employment agreement. It seems that from the very first meeting with the Ahujas, Miness was to stay at the facilities for four or five years as a consultant in order to train their son, and to ensure an orderly transition from the relationship he had with the medical community, the North Shore Hospital System, St. Francis Hospital and the staff that had been with him for 25 or 30 years. Then in May 2008, the defendants wanted Miness to become an employee and enter into an employment agreement. Further, they wanted to include census levels in the employment agreement, meaning that if there was less than 90 percent occupancy, he could be terminated as an employee. Miness testified that this was a "huge deviation" from which was agreed upon. Previously, according to Miness, the parties had agreed that he would be a consultant to the new companies at the health facilities for a period of three or four years at a compensation of at least $300,000 a year, for a total compensation to him from $900,000 to $1 million.

Miness objected "strongly and vociferously" to the 90% occupancy standard.

Q. Why were you objecting again?

A. Because I would not have necessarily had control over that percentage or the admissions in terms of their fulfilling their obligations to me under the agreement. And if they didn't, I was pretty sure that the 90 percent would drop below 90 percent, and then I would be vulnerable, and a lot of the money that was supposed to come from this part of the deal would be taken away.

(Tr. at 30.)

Notwithstanding his objection, Miness felt he had to close this deal and he did so. During this period from May through August 2008, Miness was very "stressed out," and he thought there would be a good chance he would lose the deal. During that period the nature of his conversation with Schulman changed. He explained to Schulman and to Gershowitz "what was going on in the negotiations in a much more specific way ... about the employment contract and what my fears were about it." (Tr. at 31.) He discussed with Schulman his fear that they could use the census requirement to terminate his consulting agreement and that it could cost him at least $1 million in consulting compensation. He discussed with Schulman that his attorney, Francis Deegan, would not be able to represent him in the issue of the census based employment agreement because he and his staff would have to be witnesses. He also discussed with Schulman the "notion" of an implied covenant of good faith.

Miness also discussed with Schulman and Gershowitz the fact that Sanjay Ahuja bought 45 percent of a facility and hasn't "set one foot in the door yet." (Tr. at 35.) He also discussed the problems he was having with the Ahujas including his complaints that Veena and Sanjay represented that they would work with him to promote the business of the nursing homes, and they did not. Instead they locked themselves in an office; didn't spend time with the staff or him; and did not make the agreed upon renovations to the plant and equipment in a timely fashion. According to Miness, these policies decreased the census and endangered his consulting agreement. He expressed these concerns with Schulman in the course of the golf games and other social relationships and meetings. He discussed with Schulman the issue of the census and his employment contract "in very specific terms." He discussed with Schulman his fear that the Ahujas could invoke the census requirement and terminate his employment agreement and that his attorney Deegan could not represent him in such a dispute. In particular, he discussed with Schulman that the Ahujas would not do what they were supposed to do so that he would not have the ability to maintain the 90% census.

In a significant question, Miness was asked whether Schulman offered to provide legal representation to him:

Q. In response to that information, did Mr. Schulman offer to provide legal representation to you?

A. Mr. Schulman, from—I guess it was when the employment contract issue closed at the first closing in August, going forward, repeatedly said to me: Michael, whatever you need me to do, I will do. Whatever you need me for, I will be there for you.

And then he gave me certain advice. I mean, he told me to confront the Ahujas with regard to the employment contract and the fact that they had not completed the work that they were scheduled to do.

And I followed his advice. I went to Sanjay and asked him, and his response to me was that they understood that they hadn't met their obli-

gations, and of course they were not going to enforce the condition because they understood they hadn't done what they were supposed to do in the interim.

(Tr. at 40.)

Miness also told Schulman that he was in deep financial trouble and that he couldn't hold out any longer and would have to agree to the employment contract. He also told Schulman that it was attorney Deegan's opinion that he, Deegan, would have to testify about the renovations, the cash infusions and the 90 percent census. He explained to all of his friends, Schulman included, that he didn't have any options left because he could not pay the costs.

In early December, 2008, Miness was at a breakfast meeting with Schulman and Gershowitz at the Old Westbury Golf and Country Club. Other people came in later. At that time, Miness discussed the impending second closing. He expressed his concerns to Schulman that he had been set up and that the defendants were going to try to enforce the 90 percent rule and he would be terminated and lose the balance of his million dollar compensation from the employment agreement. He also told Schulman that Sanjay was hiding in his office and never spoke to Miness or the staff and also was not meeting his obligations that would increase occupancy. For example, Sanjay's father was supposed to be out soliciting in the community and doing the renovations, but was not doing that. As a result, cash flow stagnated and there was a census drop. Schulman told him what he should do, in his opinion, which was to confront them immediately, which he did. Following Schulman's advice Miness did confront Sanjay on Tuesday or Wednesday of that week. Sanjay told him that "we understand that

we've not met our obligations and that you are doing the best you can." (Tr. at 47.)

Significantly, Miness testified that Schulman offered to assist him as counsel, if there was a dispute with the Ahujas.

Q. Did Mr. Schulman, at this December 8th meeting, before you told him of the results of your conversation with Sanjay, did he ever offer to assist you as counsel if there was any dispute with the Ahujas?

A. Absolutely. He offered that many times in the past, particularly on December 8th.

Q. Is there any doubt as a businessman he was soliciting you to retain him as a lawyer?

A. There is no doubt in my mind that Michael offered to handle my legal issues with regard to the Ahujas.

Q. After your conversation with Sanjay in which he assured you they couldn't or wouldn't enforce the census requirement, did you tell Mr. Schulman about that conversation?

A. Most definitely. It was his suggestion that I have it.

Q. And did he again implore you to retain him? Did he offer his services in any way?

A. He offered his services, and at that point I didn't see the need to have an attorney. There was no case to be had at that point.

(Tr. at 48.)

After the second closing, Miness testified that he was completely shut out by the Ahujas. He was not invited to staff meetings; he wasn't included in discussions with the architects; admissions policies were changed without his knowledge; and staff were told not to speak with him. He called it a "horrific situation." (Tr. at 49.)

Miness related these matters on a continuing basis to Schulman and Gershowitz.

Q. And did Mr. Schulman continue to offer to assist you as counsel in any way he could?

A. Absolutely.

Q. Is there any doubt in your mind in these subsequent conversations that he was soliciting you to retain him as counsel?

A. He certainly was offering to represent me if I needed him.

Q. Would he ever have known your motivations, your thought process and observations, concerning the disputes with the Ahujas if he—if you weren't talking to him with the potential view of retaining him as an attorney?

A. I guess from the point of May of 2008 forward, that relationship changed from just being a friend. I was getting legal advice from a buddy and—who might potentially represent me.

(Tr. at 49–50.)

Miness was terminated on April 28 or 29, 2009 by Veena Ahuja after the occupancy dropped to 89 percent. That same day, Miness called Schulman, told him he was terminated and met him at Dunkin Donuts some days shortly thereafter. At this meeting, they discussed the implied covenant of good faith and whether the situation lent itself to employment contract litigation. Schulman told him "he thought it was an employment contract litigation." (Tr. at 52.) However, the reason Miness met with Schulman at Dunkin Donuts was to return a sealed package to him that Schulman had given him months before and asked him to hold in his office. Schulman told him to keep the package "secure." When the Ahujas asked Miness to leave his office, he removed Schulman's

sealed package and gave it to Schulman at Dunkin Donuts. Schulman wanted to keep this package a secret from everyone.

On cross-examination, it was elicited that many of the conversations Miness had with Schulman were also spoken in front of Gershowitz, who is not an attorney. Also, Miness never showed Schulman any documents. It was also brought out that if the Ahujas defaulted and refused to close, he would be entitled to the contract deposit of $1 million. In addition, Miness resigned from the Old Westbury Club in 2009, and he and Schulman did not play together at all in 2009. Miness testified that they played golf for 10 or 12 years on a fairly regular basis, but the last several years not being as regular because Schulman was ill. In the years 2007 and 2008, they played less regularly, perhaps half of the usual Saturdays and Sundays.

Miness talked to Schulman in generalities until May to August 2008, and after he became more agitated was more specific with regard to his concerns about the Ahujas. Miness also testified that he has been to Schulman's law office. In a supporting affidavit Miness stated that Schulman was a "collection attorney" and that his reputation wasn't great. Miness conceded that he never asked Schulman to review the employment agreement or the stock purchase agreements. However, Schulman did give him his opinion as to the employment agreement "on several occasions." (Tr. at 70.)

Interestingly, Miness stated that almost every statement that he made concerning his discussions with Schulman are in the complaint in this action. However, Miness testified that he gave confidential information to Schulman that was not in the complaint.

Q. Isn't it a fact, Mr. Miness, you didn't give me any confidential information that is not in your com-

plaint, okay, or that you haven't said in prior affidavits? Isn't that true?

A. No.

Q. What confidential information?

A. You knew about the financial pressure I was under. You knew the stress of not closing would create problems—

Q. Let's discuss it one at a time.

MR. ROSENBERG: Let him answer.

THE COURT: Okay.

A. No matter what you and I say, you and I sat many times and discussed the financial situation I was in. You understood that this was a last ditch effort to bail myself out of a terrible financial problem. You understood my strength and weakness in terms of my negotiations. And that was knowledge that was not commonplace.

(Tr. at 74, 75.)

However, Miness also shared this information with Gershowitz, who was his friend, confidant, and advisor; however, Miness went into more detail with Schulman. Schulman brought out that Gershowitz could be subpoenaed in this case. He told Gershowitz about his concerns about the employment agreement, the census requirement and his concerns about the Ahujas not abiding by the employment agreement. In addition, Miness testified that he never retained Schulman as an attorney, not even for collection work, nor did he ask him to review anything; nor did they have a "signed" attorney-client relationship.

In May 2008, the conversations between Miness and Schulman changed. Prior to that, their discussions were in more general terms with regard to his selling his facilities to the Ahujas and the various closings. However from May to August, the conversations "got more and more in depth." (Tr. at 95.) Miness also told Schulman that he mortgaged his home.

Q. And I believe your testimony was that sometime around May of 2008 the conversation changed?

A. Yeah. I think through the period of the signing and through May, a lot of things changed. My financial condition in August, I talked about they were trying to press me into an employment agreement with a census component, which I felt very disturbing; that the million dollars I thought I would be getting with regard to my consulting agreement would be put into an employment agreement with the condition of a census.

Those conversations got more and more in depth through August and May.

Q. Now, when you say "in depth," what more did you share?

A. I shared my concerns. I shared my concerns with regard to the concept of the employment contract, about the economic disadvantage it would put me into, and the possibility that I'm not going to be able to provide—maintain the census if they don't do what they are supposed to do in the early stages of the closing.

Q. Anything else?

A. I discussed with you my general economic situation in terms of the pressure I was under and my inability to withstand the pressure they would put on me to sign those documents. Because without the closing, I would probably go into bankruptcy.

Q. Anything else?

A. I can't think of anything more off the top of my head.

(Tr. at 95, 96.)

Miness shared this information with Gershowitz, and the same allegations are in the complaint. Miness also conceded that the defendants themselves were supplied with "vast amounts of financial documents," (Tr. at 99), and were aware of much of his financial situation.

In April 2009, Miness was terminated. He called Schulman's office and told him of the termination and also that he had a package from Schulman that he wanted to return. They met at Dunkin Donuts and talked about his termination. Schulman told him he thought "it was an employment case." Miness did not at that time show Schulman any e-mail or personal files or notes from his attorney concerning the Ahujas. However, again significantly, Miness testified that at the meeting at Dunkin Donuts, Schulman offered to be his attorney.

Q. That you and I did not meet at Dunkin' Donuts until a week later, May 7th?

A. I told you that I wasn't sure the date, but I got an e-mail from the Ahujas discharging me, and I was a little shook up. But I don't remember the date.

Q. Is there any reason to believe that it wasn't May 7th?

A. I'll repeat: I don't know specifically. All I know, I met with you, discussed the case with you. You offered to be my attorney, and I gave you the package that you didn't want to let anyone know about.

\* \* \* \* \* \*

BY MR. SCHULMAN:

Q. What advice did you (sic) give you with regard to this issue other than to speak to the Ahujas concerning your employment agreement?

A. At the meeting at Dunkin' Donuts, you suggested this was an employment litigation and that you would be more than happy to represent me in that employment litigation. You believed there was a good— good chance of our succeeding in that regard and that you were available to do that for me or anything else I needed you to do as an attorney and a friend.

\* \* \* \* \* \*

Q. Did I give you any other legal advice concerning this transaction?

A. I think that during the period from August—from May to August, you were constantly recommending me—for me to do certain things with regard to the Ahujas, such as meetings with them. You were concerned where this was heading, and you were very concerned what would happen to me and offered consistently to represent me.

(Tr. at 111, 121–24.)

Further, concerning the meeting between Miness and Schulman at Dunkin Donuts, Miness testified that in addition to giving a package to Schulman, they discussed his potential lawsuit against the Ahujas and, more importantly, Schulman suggested that he speak directly to Deegan, his then counsel. However, at that time Miness didn't give Schulman any documents involved in this case.

Miness testified that at "every conversation we had, you had an opinion and suggestion with regard to an action." (Tr. at 125.) He assumed Schulman was giving him this advice both as a friend and as an attorney. He also shared the same issues with Gershowitz. As a director of housing in the same field, Gershowitz had similar

professional experience to Miness. However, Miness stated that Schulman had more extensive knowledge of his affairs than Gershowitz. Miness believed that Schulman's knowledge about his business and personal affairs has already been used by the Ahujas.

Q. Did Mr. Gershowitz also know your personal financial situation?

A. I don't believe he knew the full extent, but he knew we were losing money in the business and that I was having a tough time.

Q. That was the same information that you shared with me?

A. No. You had more extensive knowledge. Don't forget, we had private conversations on telephone calls on a regular basis over an extended period of time. It wasn't just a breakfast.

Q. So let's go back to those telephone conversations.

What information did you impart to me that you deem confidential during those telephone conversations, other than what you've testified?

A. Everything having to do with this deal was in confidence to a friend, to an attorney and my other friends. And I was not expecting it to be circulated as common knowledge to the world.

Q. What information was to be circulated to the world?

A. The economic leverage.

Q. What information was used, Mr. Miness, specifically?

A. You have hit us with umpteen motions, knowing I don't have the financial wherewithal to sustain. And that was done, I believe, in a purposeful way with respect to my financial condition.

(Tr. at 126, 127.)

In addition, Miness told Schulman that Deegan could not represent him in the dispute with the Ahujas in connection with the employment agreement, because Deegan would be a witness. He also told Schulman that he had exhausted his economic resources by borrowing heavily against his home.

Howard Gershowitz is on the board of a nursing facility and has experience and expertise in healthcare business. He has been a good friend of both Miness and Schulman for the last ten years. He met them at Old Westbury County Club and played golf with them on both Saturday and Sunday and other times. Gershowitz even played with them in the winter with mittens and hats. In addition, they socialized at dinners and attended functions together. "We were close friends." (Tr. at 166.) They discussed the plaintiff's transaction with the Ahujas and the sale of the plaintiff's four facilities and that "Miness had gotten very nervous about what was evolving." (Tr. at 167.)

In particular, Miness discussed an employment contract that was being imposed on him and the occupancy level. He said that the employment contract represented a material change from prior agreements, which had no census requirement. From and after August 28, 2008 to May 1, 2009 the nature of their conversations changed. Miness was clearly upset and confused as to the actions of the Ahujas. During this period Schulman told the plaintiff to address this issue directly with Sanjay. The issue of representation by attorney Deegan was also discussed.

Q. Did you ever hear Mr. Miness, in conversations with Mr. Schulman, discuss the subject matter that Fran Deegan might be disabled

from representing him in regard with any conflict with the Ahujas?

A. Yes.

Q. Can you tell me the substance of that conversation?

A. Well, the subject of that conversation was there was a potential issue regarding the consulting agreement, and that if it got to litigation, that Mr. Deegan would be called to testify, and therefore he could not, you know—I don't know the legal terminology for it—he could not go any further. He could not represent Mr. Miness in this conflict.

(Tr. at 182–83.)

Significantly, the hearing revealed that the friends also discussed the topic of the implied covenant of good faith.

Q. In the course of the discussions during the period August 28th, 2008, through May 2009, subsequent to the first closing, do you recall any discussions between Mr. Miness and Mr. Schulman which incorporated the subject matter of the term, quote/unquote, an implied covenant of good faith?

A. I believe the answer is yes. I believe I heard that.

Q. And what was your understanding of what an implied covenant of good faith was in the context of those discussions?

A. My understanding was that in the original negotiation, that there were certain representations made to Mr. Miness that he would count on, you know, going forward. And it is my understanding of the implied covenant of good faith.

Q. Was it your understanding that if those representations were not performed, that would be some form of impediment to the Ahujas enforcing the census requirement?

A. Absolutely.

(Tr. at 183–84.)

During their many conversations, Miness solicited Schulman's advice and Schulman responded on more than one occasion, "I want to help you. I'll do everything I can to help you." (Tr. at 186.) Of importance, Gershowitz also testified that "It was clear that he was an attorney and that he was representing himself as an attorney and a friend ... I think he was offering him as an attorney." (Tr. at 186.) Schulman made this offer more than once. Schulman apparently gave Miness informal legal advice. In addition, Miness discussed with his friend his poor economic situation and that he was forced to draw equity from his home. Miness told them his economic situation was so bad that "he might have to abandon his home." (Tr. at 192.) Gershowitz considered their conversation to be confidential and that Miness expected that the two friends would not disclose these conversations to third persons.

On cross-examination of Gershowitz, it was brought out that Schulman was not a regular member of the golf club during certain years; that he had a cardiac health problem and was hospitalized; and in August 2006 to March 2007, he did not play golf, but joined his friends for breakfast.

**B. The Case of Attorney Michael P. Schulman**

Schulman testified in narrative form. He and Miness played golf together from 2004. After he developed cardiac problems their meetings declined to 12 times a year. In 2004 and 2005 he was only a weekday member of the golf club. He remarried in March 2006 and renewed his Saturday and Sunday golf games. In August 2006, he suffered a cardiac event and

had a second surgery and thereafter, did not play winter golf. He then played one day with his wife and one day with Miness and Gershowitz.

Schulman denied that Miness mentioned anything about the Deegan firm being unable to represent him. He testified that they did discuss issues with regard to Miness' business. However, Schulman said that, "I can also categorically state that during that period of time I did not solicit Miness for his business." (Tr. at 239.) When the plaintiff was terminated on April 30, 2010 he called Schulman. On May 6, 2010, they spoke on the telephone and decided "to grab a cup of coffee." They met at Dunkin Donuts on Route 110. They talked about the fact that Miness was terminated and that he retained counsel. After that they never got together again except on the phone periodically.

Schulman also testified that Miness never showed him one piece of paper or agreement and never asked his opinion or any of his business matters. Schulman knew that he "closed" and "may have had a second closing, and that was it." (Tr. at 243.) Schulman also testified about his conversations with Miness, as follows:

> Everything we talked about was basic conversation, basic complaints, basic— the same way he complained about other things. If he had an issue with his wife and I had an issue with my wife, he had an issue with his business or I with my business, we talked about it.

> But nowhere was it ever intimated by Mr. Miness that he was talking to me other than a person whom he knew at the club and whom he golfed with, the same way he did with Mr. Gershowitz and others.

> So I can categorically state under oath during that entire period of time we had no such conversations.

I can also state, your Honor, I did not know anything about his personal situation at all. I did not know he was behind on his mortgage. I didn't know about foreclosure.

The only way I knew about the fact that he refinanced, because I found out and I was trying to do research for the testimony today to see who represented him in different areas. And that is how I found out that the Crowe Deegan firm represented him with regard to his refinancing.

(Tr. at 244–45.)

As to his representation of the Ahujas, Schulman testified that he was contacted by them late in May 2009. They settled on Schulman for "various reasons" having to do with the fact that "my pricing was right, I guess and they knew another attorney at the club who happened to be their best friend Peter Roach ... who recommended me." (Tr. at 246.)

Schulman also explained that he was married in March of 2006 and was a little short with regard to the wedding expenses, and he borrowed $10,000 from Miness and repaid it within 30 days. Also, he placed some ads for the plaintiff's step son. Also, "we went to golf outings together and did a lot of different things together." (Tr. at 247.) Schulman also denied that there was a "secret package." In sum, Schulman testified that Miness did not give him any confidential information and the information he did give him was "superficial at best." He did know that Miness was "in contract" and was going to a closing. His closing remarks were as follows:

> Again, your Honor, I was someone who was an attorney second, but not at all when it came to the relationship with Mr. Miness. I was someone he played golf with on a regular basis for a num-

ber of years. But after 2004 it was on a much less frequent basis.

That is my testimony, your Honor. (Tr. at 250.)

On cross-examination, Schulman testified that when he first met Miness about 10 years ago, they had a discussion about him being retained as counsel. Interestingly, when questioned as to why attorney Roach recommended him to the Ahujas, he responded as follows:

Q. And what was the nature of the work you did for Mr. Roach that he deemed appropriate for you to represent the Ahujas in this matter?

A. You have to ask him. I don't know. (Tr. at 265.)

When the plaintiff was terminated, he told Schulman "I didn't meet the census." (Tr. at 288.) He also told Schulman that he had a conversation with Sanjay Ahuja on the census requirement issue, to "work it out." (Tr. at 291.) He stated that in April or May 2009 his friendship with Miness diminished, and they saw each other after one time and spoke on the phone occasionally. Still, Miness did call Schulman to tell him he was upset and was going to speak to his attorney Deegan.

In his redirect testimony, Schulman reiterated his statements that he and Miness had a golf relationship only, and just shared "general information in the business world, the same as his with Mr. Gershowitz." (Tr. at 307.) In addition he reiterated he contention that "everything he claims is in his complaint." (Tr. at 307–08).

## III. DISCUSSION

■ A federal trial judge has inherent power to disqualify an attorney to "preserve the integrity of the adversary process." *Hempstead Video, Inc. v. Incorporated Village of Valley Stream*, 409 F.3d 127, 132 (2d Cir.2005) (quoting *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979)). A judge exercises this power in his sound discretion. *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir.1994).

■ In determining whether to disqualify an attorney, federal judges generally look to the rules of professional conduct for the locality in which they sit. *See Hempstead Video*, 409 F.3d at 132; *Amusement Industry, Inc. v. Stern*, 657 F.Supp.2d 458, 460 (S.D.N.Y.2009). However, a federal judge need not strictly adhere to these rules in making this determination. *Id.* Rather, a judge must also generally "balance [1] a client's right freely to choose his counsel against [2] the need to maintain the highest standards of the profession." *Hempstead Video*, 409 F.3d at 132 (internal quotations and citations omitted).

■ In the Second Circuit, the public's right to retain counsel of their choosing is a strong one, and for this reason, disqualification is generally viewed with disfavor. *See Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir.1981); *Amusement Industry*, 657 F.Supp.2d at 460. Nevertheless, disqualification is a fact-intensive endeavor, and in rare cases, disqualification may be appropriate even based merely on the appearance of impropriety. *Nyquist*, 590 F.2d at 1246; *Armstrong v. McAlpin*, 625 F.2d 433, 446 (2d Cir.1980), rev'd on other grounds, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981); *Blue Cross and Blue Shield of New Jersey v. Philip Morris, Inc.*, 53 F.Supp.2d 338, 346 (E.D.N.Y.1999).

■ Traditionally, federal courts sitting in New York have generally identified two bases on which an attorney could be disqualified: "(1) where an attorney's conflict of interests ... undermines the court's confidence in the vigor of the attorney's

representation of his client, ... or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation ... thus giving his present client an unfair advantage." *Nyquist*, 590 F.2d at 1246 (internal citations omitted); *see also Tradewinds Airlines, Inc. v. Soros*, No. 08–cv–5901, 2009 WL 1321695, *4 (S.D.N.Y. May 12, 2009).

However, on April 1, 2009, New York adopted a new Code of Professional Conduct for attorneys that provides a third basis for disqualification: namely, where an attorney is in a position to use confidential information obtained from a *potential* client. This ground for disqualification derives from the New York Code of Professional Responsibility Rule 1.18, a rule that has no direct analogue in New York's pre-April 1, 2009 disciplinary rules. Rule 1.18 provides in pertinent part:

(a) A person who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect to a matter is a "prospective client."

(b) Even when no client-lawyer relationship ensues, a lawyer who has had discussions with a prospective client shall not use or reveal information learned in the consultation....

(c) A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph

(d) [which no party here asserts applies]....

Here, the plaintiff asserts that he was a "prospective client" of defense attorney Schulman, and that through their "consul-

tations", Schulman learned confidential information concerning the present case. It is on this basis that the plaintiff seeks to disqualify Schulman. For his part, Schulman does not contest that Rule 1.18 may provide grounds for the disqualification of an attorney. Rather, Schulman denies that Miness was his prospective client, and further denies that he obtained confidential information from the plaintiff relating to this case.

The Court agrees that Rule 1.18 may provide the basis for disqualification of an attorney. The Court therefore addresses in turn the issues of (1) whether Miness was a prospective client of Schulman and (2) whether Schulman possessed relevant confidential information from Miness. The Court finds that both of these prongs are satisfied in this case, and that the integrity of the adversarial process requires Schulman's disqualification. Therefore, the Court disqualifies Schulman from representing the defendants in this case. A.

A. A "Prospective Client"?

 Without doubt, Miness was not a prototypical "prospective client" for Schulman. Miness never met with Schulman in Schulman's law office concerning this matter; the two never signed any kind of retainer agreement; and they never had a formal discussion concerning Schulman's representation of Miness. However, despite the lack of the usual formal "prospective client" aura, the Court finds that the totality of the parties' relationship demonstrates that Miness was a prospective client of Schulman.

First, the Court finds that Miness and Schulman had a close personal relationship for a long period of time, and that both men discussed significant business-related issues with the other. Second, the Court finds that, within the context of this ongo-

ing relationship, Miness and Schulman discussed in significant detail the events underlying this case as they took place. Third, the Court finds as a factual determination based on the evidence at the hearing, that during certain of these discussions, Schulman offered his legal services to Miness. In addition, the Court also finds that, after Schulman had offered his legal services to Miness, Schulman continued to meet with Miness socially, continued to discuss with him issues related to the present case, and repeated his offer of representation.

Based on the totality of this evidence, the Court finds that Miness was a prospective client of Schulman with respect to the issues underlying this case. Because of the unusual factual situation in this case, the Court clearly states that its present holding is limited to the facts in this case. The Court does not suggest that all of an attorney's relations with friends—even long-term, close relations—will bar all future attorney—client relationships that are adverse to those friends. However, given the facts of this case, the Court finds that (1) the personal relationship between Miness and Schulman, (2) the substance of their regular discussions, and (3) the repeated offers of representation by Schulman, rendered Miness a prospective client of Schulman.

B. "Confidential Information"

■ Rule 1.18 does not bar attorneys from representing all parties adverse to their prospective clients. Rather, the rule prohibits an attorney from opposing a prospective client when the attorney has confidential information from the prospective client "that could be significantly harmful to that person in the matter." Rule 1.18. Thus, as the Court has found that Miness was Schulman's prospective client, the Court must now determine whether Schul-

man possessed confidential information from Miness that could be significantly harmful to Miness in this case.

Miness asserts that he discussed events related to this case in detail with Schulman as they took place, and that Schulman was thus privy to a broad spectrum of disqualifying confidential information. To the contrary, Schulman maintains that he had only superficial conversations with Miness concerning the facts underlying this case, and that the conversations he did have with Schulman were in the presence of third parties. Moreover, Schulman argues that, even should the Court credit the testimony by Miness over his own, virtually everything that Miness asserts that he told Schulman is now alleged in the present complaint. Thus, according to Schulman, none of the information Miness gave him is confidential, and moreover, none of it could be "significantly harmful" to Miness in this matter.

As noted above, the Court credits the testimony of Miness, and finds that Miness and Schulman did discuss the facts underlying this case in detail and as they happened. However, the Court agrees with Schulman that some of the topics that Miness said he discussed with Schulman were made public prior to Schulman's retention by the defendants. Nevertheless, the Court finds that Schulman did obtain confidential information from Miness that could be significantly harmful to him. As already noted, this case does not involve an ordinary, formal consultation between an attorney and a prospective client. Rather, it involves long-term, real-time discussions between them. Thus, while it is true that the broad outlines of Miness and Schulman's discussions appear publicly in the complaint, Schulman still received information from Miness related to this case that is not public, including (1) the plaintiff's present thoughts and feelings on

the developing situation, (2) the plaintiff's personal accounts of each relevant event shortly after it happened, and (3) the plaintiff's strategic thinking concerning how to manage the situation. All of these things Miness shared with Schulman, and though they are not necessarily definitive in the case, the Court finds that Schulman's knowledge of these personal and business matters could be significantly harmful to Miness. This would be especially true if the case proceeds to trial. During the trial, Schulman's first-hand knowledge of the plaintiff's intimate thoughts and actions at the time of the relevant events could substantially and unfairly provide his clients with an advantage. The most likely example Court can perceive of is an unfair cross-examination of Miness by Schulman, based on Schulman's knowledge of the personal feelings and thoughts of Miness.

The Court notes that it is not persuaded by Schulman's contention that the presence of a third party—usually Gershowitz, a confidante of Miness—rendered Schulman's discussions with Miness to be non-confidential. First, there was credible testimony at the hearing that Miness and Schulman had more than one conversation concerning this matter without the presence of any other party. Second, the presence of a third party does not necessarily mean that, for the purpose of Rule 1.18, the information shared with Schulman is not confidential. Rule 1.18 is not a rule of evidence, but rather governs the propriety of an attorney's representation of clients. Thus, to the extent that information gleaned from a potential client is "confidential" in the generic sense of the word—that is, the information is available only to a select group of intended recipients—then the Court views it as confidential for the purposes of Rule 1.18. Therefore, Gershowitz's presence at many of the discussions between Miness and Schulman does not affect the Court's finding that Schulman

gained confidential information from Miness concerning this case which could be used to prejudice Miness.

## C. Disqualification of Schulman

■ Although the Court looks to the New York Code of Professional Responsibility as the basis of its disqualification of Schulman, the Court notes that this disqualification also accords with the necessity of preserving the integrity of the adversary process. *Hempstead Video*, 409 F.3d at 132. It is obvious to the Court that Schulman's representation of the defendants under this factual scenario does not accord with the expected operation of the adversary system. A party ought not to have to face in court an attorney whom that party treated as a personal confidante, and potential legal representative, with regard to the very matter being litigated. If Schulman remained as counsel for the defendants, Miness would have to face this untenable dilemma.

As stated above, the Court is well aware of the Second Circuit's strong admonition against disqualification of an attorney. However, in this case, the Court notes that the defendants' right to select counsel is, though still strong, somewhat mitigated. Schulman testified that he had never represented the defendants prior to the present case, and Schulman did not indicate any other significant personal or business relationship with them. Rather, Schulman indicated that a mutual friend—who belonged to the Old Westbury Country Club just as did Schulman, Miness, and the defendants—referred him to the defendants. The defendants are thus not being deprived of long-time counsel. Moreover, the Court infers from these circumstances that the defendants were aware of the relationship that Schulman had with Miness. To the extent that they were not, the Court is reasonably certain that Schul-

man would have explained it to them. In the Court's view, a reasonable party, before retaining Schulman, even if unfamiliar with the relevant ethical rules, would have considered the potential conflict that Schulman faced in representing the defendants in this matter. Thus, the defendants may well have been aware of the factual basis underlying the Court's present disqualification of Schulman.

## IV. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Michael Schulman, Esq., is disqualified from representing the defendants in this case, and it is further

**ORDERED** that this case shall be stayed in its entirety for thirty days to provide the defendants with the opportunity to retain new counsel.

**SO ORDERED.**